JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
GWENDOLYN DUFFIELD

## DEFENDANTS
LEGEND SPINE, LLC, ET AL.

**(b)** County of Residence of First Listed Plaintiff  Montgomery County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Lehigh County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bryan R. Lentz, Esquire - Anton Kaminsky, Esq.
1524 Locust Street, Phila., PA  19102

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ☒ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | | | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation - Transfer
- ❏ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fair Labor Standards Act, 29 U.S.C. §201 et seq. ( " FLSA " )
Brief description of cause:
Defendant's failed to pay compensation and retaliated against Plaintiff.

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
IN EXCESS OF $150,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  8/15/19

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

| ADDITIONAL DEFENDANTS |
| --- |
| ARGOVIAN TECHNOLOGIES, LLC<br><br>Montgomery County, PA |
| DR. CHRISTOPHER WAGENER<br><br>Lehigh County |
| STEVEN MARINELLI<br><br>Bucks County, PA |
| EDWARD KARPOWICZ<br><br>Gloucester County, NJ |
| MICHAEL BLACK<br><br>Chester County, PA |

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 109 Magnolia Court, Collegeville, PA _____

Address of Defendant: _____ Def #1 - 1803 Apple Tree Lane, Bethlehem, PA [see attached] _____

Place of Accident, Incident or Transaction: _____ Pennsylvania _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 08/15/2019 _____ 71383

*Attorney-at-Law / Pro Se Plaintiff*                *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* _____ FLSA 29 U.S.C. §201 et seq. _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Bryan R. Lentz, Esquire _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 08/15/2019 _____ 71383

*Attorney-at-Law / Pro Se Plaintiff*                *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

| ADDITIONAL DEFENDANTS |
| --- |
| ARGOVIAN TECHNOLOGIES, LLC<br><br>Montgomery County, PA |
| DR. CHRISTOPHER WAGENER<br><br>Lehigh County |
| STEVEN MARINELLI<br><br>Bucks County, PA |
| EDWARD KARPOWICZ<br><br>Gloucester County, NJ |
| MICHAEL BLACK<br><br>Chester County, PA |

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### <u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>

| | | |
|---|---|---|
| GWENDOLYN DUFFIELD | : | CIVIL ACTION |
| | : | |
| v. | : | |
| LEGEND SPINE, LLC, ET AL. | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.        ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)        ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.        ( X )

| | | |
|---|---|---|
| 8/15/19 | | PLAINTIFF |
| **Date** | **Attorney-at-law** | **Attorney for** |
| | | |
| 215-735-3900 | 215-735-2455 | blentz@bochettoandlentz.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GWENDOLYN DUFFIELD**<br>109 Magnolia Court<br>Collegeville, PA 19426 | : |
| | : |
| *Plaintiff* | :     CIVIL ACTION NO. |
| | : |
| v. | : |
| | : |
| **LEGEND SPINE, LLC**<br>1803 Apple Tree Lane<br>Bethlehem, PA 18015 | : |
| | : |
| *and* | : |
| | : |
| **ARGOVIAN TECHNOLOGIES, LLC**<br>300 Old Reading Pike, Suite 31<br>Stowe, PA 19464 | : |
| | : |
| *and* | : |
| | : |
| **DR. CHRISTOPHER WAGENER**<br>1803 Apple Tree Lane<br>Bethlehem, PA 18015 | : |
| | : |
| *and* | : |
| | : |
| **STEVEN MARINELLI**<br>346 Barnsbury Road<br>Langhorne, PA 19047 | : |
| | : |
| *and* | : |
| | : |
| **EDWARD KARPOWICZ**<br>215 Champion Way<br>Sewell, NJ 08080 | : |
| | : |
| *and* | : |
| | : |
| **MICHAEL BLACK**<br>739 Country Club Road<br>Phoenixville, PA 19406 | : |
| | : |
| *Defendants* | : |

## CIVIL ACTION COMPLAINT

**AND NOW** Comes Plaintiff, Gwendolyn Duffield ("Gwen") by and through her undersigned counsel, Bochetto & Lentz, P.C. ("B&L") and avers as follows in support of her Complaint against Defendants, Legend Spine, LLC ("Legend Spine"), Dr. Christopher Wagener ("Dr. Wagener"), Steven Marinelli ("Mr. Marinelli"), Edward Karpowicz ("Mr. Karpowicz"), and Michael Black ("Mr. Black"):

## I.   SUMMARY

1.    This is an action for an award of damages, declaratory and injunctive relief, attorney's fees and other relief on behalf of Plaintiff, Gwendolyn Duffield ("Gwen" or "Plaintiff"), a former employee of Defendants, Legend Spine, LLC ("Legend Spine") and Argovian Technologies, LLC ("Argovian"), who has been harmed by the unlawful and retaliatory conduct of Defendants.

2.    This action is brought under the Fair Labor Standards Act, 29 U.S.C. §201 et seq. ("FLSA"), the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1, et. seq, and Pennsylvania common law.

3.    Pursuant to the WPCL, Legend Spine shareholder Defendants, Christopher Wagener ("Dr. Wagener"), Steven Marinelli ("Mr. Marinelli"), Edward Karpowicz ("Mr. Karpowicz"), and Michael Black ("Mr. Black") are agents of Legend Spine who participated in refusing to pay Plaintiff's wages and/or wage supplements and are ***personally liable*** pursuant to the WPCL.

4.    Pursuant to the WPCL, Argovian shareholder Defendants, Steven Marinelli ("Mr. Marinelli"), Edward Karpowicz ("Mr. Karpowicz"), and Michael Black ("Mr. Black") are agents of Argovian who participated in refusing to pay Plaintiff's wages and/or wage supplements

and are ***personally liable*** pursuant to the WPCL.

## II.     PARTIES

5.     Plaintiff, Gwen is an adult individual residing at 109 Magnolia Court, Collegeville, PA 19426.

6.     Defendant, Legend Spine is a Pennsylvania Limited Liability Company with a registered business address at 1803 Apple Tree Lane, Bethlehem, PA 18015.  According to Legend Spine's website, www.legend-spine.com, Legend Spine holds itself out as being located at 13 Summit Square Center #199, Langhorne, PA 19047.

7.     Defendant, Argovian Technologies, LLC ("Argovian") is a Pennsylvania Limited Liability Company with a registered business address at 300 Old Reading Pike, Ste 3A, Pottstown, PA 19464.  According to Argovian's website, www.argovian.net, Argovian holds itself out as being located at 300 Old Reading Pike, Suite 31, Stowe, PA 19464.

8.     Defendant, Dr. Christopher Wagener ("Dr. Wagener") is an adult individual who may be served at 1803 Apple Tree Lane, Bethlehem, PA 18015.  Mr. Wagener is a Class A Member and Chief Medical Officer of Legend Spine.

9.     Defendant, Steven Marinelli ("Mr. Marinelli") is an adult individual who resides and may be served at 346 Barnsbury Road, Langhorne, PA 19047.  Mr. Marinelli is a Class A Member and President and Chief Executive Officer of Legend Spine.  Mr. Marinelli is a 25% owner of Argovian.

10.     Defendant, Edward Karpowicz ("Mr. Karpowicz") is an adult individual who resides and may be served at 215 Champion Way, Sewell, NJ 08080.  Mr. Karpowicz is a Class A Member and Executive Vice President of Business Development for Legend Spine. Mr. Karpowicz is a 25% owner of Argovian.

11.     Defendant, Michael Black ("Mr. Black") is an adult individual who resides and may be served at 739 Country Club Road, Phoenixville, PA 19406. Mr. Black is unofficially a Member of Legend Spine, but participated in the decision not to pay Gwen wages and/or wage supplements. Mr. Black is a 25% owner of Argovian.

12.     Dr. Wagener, Mr. Marinelli, Mr. Karpowicz, and Mr. Black are henceforth referred to collectively as the "Legend Spine Shareholders".

13.     Mr. Marinelli, Mr. Karpowicz, and Mr. Black are henceforth referred to collectively as the "Argovian Shareholders".

14.     Although it is admitted and acknowledged that Gwen's husband, William Duffield ("Will") is a Shareholder of both Argovian and Legend Spine, and participated in the decision to hire and compensate Gwen, he was excluded from and did not participate in the decisions made in 2018 when both Argovian and Legend Spine decided not to compensate Gwen as set forth more fully below – as he was obviously in favor of paying his wife the compensation that she was owed.

15.     At all times material hereto, Defendant Legend Spine was acting through its agents, shareholders, and employees – the Legend Spine Shareholders – who were acting within their scope of authority and course of employment under the control of Defendant Legend Spine.

16.     At all times material hereto, Defendant Argovian was acting through its agents, shareholders, and employees – the Argovian Shareholders – who were acting within their scope of authority and course of employment under the control of Defendant Argovian.

17.     At all times material hereto, Legend Spine and Argovian were both engaging in interstate commerce and are therefore both an "employer" within the meaning of the FSLA and WPCL, and is accordingly subject to the provisions of each said Act.

18.     At all times material hereto, Plaintiff was an "employee" of Legend Spine and Argovian as defined under the FLSA and WPCL and accordingly is entitled to the protections of each said Act.

### III.     JURISDICTION AND VENUE

19.     This Court jurisdiction over this matter pursuant to 28 U.S.C. § 1131 as it involves the federal laws of the United States.

20.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C § 1391 because Defendants Legend Spine and Argovian are located in this district, hold themselves out publicly as being located in this district, and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

### IV.     FACTS COMMON TO ALL COUNTS

#### Gwen's Employment with Legend Spine

21.     Legend Spine is a medical device manufacturing company established in the summer of 2017.

22.     The Legend Spine Shareholders each own 19.4% of Legend Spine, with the final 19.4% being owned by Gwen's husband Will.

23.     At or about the time of formation, Mr. Marinelli named Gwen as Legend Spine's Chief Financial Officer in the company's Operating Agreement. (*See* Legend Spine Operating Agreement attached hereto as **Exhibit "A"**, at pg. 32).

24.     Shortly thereafter, a Legend Spine board meeting was held where it was agreed that Gwen would act as CFO and would be compensated with funds from the company or with equity.

25.     Accordingly, Gwen was named as Legend Spine's CFO and promised to be compensated with equity or on an hourly basis at Fifty Dollars per hour ($50 / hr) when there was money in Legend Spine's accounts.

26.     Gwen continued to act as the company CFO, for approximately six months, up to and including Spring of 2018.

27.     In or about Spring of 2018, after she had been working for several months for Legend Spine, logged approximately two hundred and ten (210) hours with no compensation whatsoever, Gwen asked to receive some of the compensation owed to her.

28.     Because "sweat equity" had been given to others who did not receive monetary compensation from Legend Spine, Gwen suggested that she could also be paid in equity in the form shares in Legend Spine in the same amount as the other individuals who received "sweat equity."

29.     Will, who was a minority owner of the company, suggested that Legend Spine Shareholders could grant shares to his wife in recognition of her work on behalf of the company, and in lieu of paying her the amounts owed.

30.     Despite previously agreeing to compensate Gwen for her time either on an hourly basis or by paying her equity, the Legend Spine Shareholders reacted angrily to Will's request, reneged on the agreement, and began a campaign to remove Gwen from the company.

31.     Within days of the request, Gwen was called to a meeting with all of the Legend Spine Shareholders.

32.     The only individual not in attendance was her husband, Will.

33.     At the meeting, Gwen was asked to justify her work for Legend Spine and justify the request for ownership shares.

34.     After the meeting, the Legend Spine Shareholders decided that Gwen would not be awarded any equity in Legend Spine and refused to otherwise pay her for the work she performed for six months for Legend Spine.

35.     Gwen notified the Legend Spine Shareholders that she believed it to be improper for the company to retain the benefit of her work without compensating her.

36.     She also reported that it was improper for the company to pay her absolutely nothing for all of her work.

37.     Shortly thereafter, on or about August 16, 2018, Legend Spine met and voted to fire Gwen as CFO.

38.     The August 16, 2018 meeting was held with the Legend Spine Shareholders – excluding Will – while Gwen and Will were on vacation.

### Gwen's Employment with Argovian

39.     Argovian is a medical device testing company established in 2016.

40.     The Argovian Shareholders each own 25% of Argovian, with the final 25% being owned by Gwen's husband Will.

41.     Gwen was hired by Argovian as the company's CFO in or about July of 2016, after Argovian's shareholders agreed that she would perform bookkeeping and other accounting services for the company at a rate of Thirty-Five Dollars per hour ($35 / hr).

42.     Gwen was promised that she would be paid on an hourly / monthly basis and as Argovian had cash flow from which to make payments due and owed to her.

43.     Between July 2016 and December 2016 Gwen worked without payment and is owed approximately $30,000 for that work.

44.     Beginning in January 2017 and continuing through July of 2018, Gwen was paid for her work on a monthly basis – but was not paid the amounts owed for 2016.

45.     Throughout 2017 and 2018, Gwen repeatedly raised the issue that she was still owed $30,000 for her work in 2016 and Argovian's shareholders represented that she would be paid those wages when the company generated enough cash flow.

46.     In August 2018, Gwen was removed from Legend Spine as described above, but continued to perform services for Argovian because the Argovian Shareholders represented that, going forward, it would be managed by her husband, Will.

47.     Between August 2018 and November 2018 Gwen continued to work for Argovian.

48.     Although, Gwen was never officially terminated, in mid-November 2018, Gwen's access to Argovian's books was revoked and she was no longer able to perform her job duties – effectively terminating Gwen's employment with Argovian.

49.     However, the Argovian Shareholders refused to compensate Gwen for her work during those months, for which she was owed approximately $15,000.

50.     When Gwen and Will sought compensation for Gwen's promised wages from 2016 as well as the wages from 2018, Argovian's Shareholders refused to pay the compensation she was owed and due.

51.     Her husband Will did not participate in the decision but would have voted to pay her the money that was owed.

52.     To date, Gwen has not received the compensation she was owed from Argovian or Legend Spine.

## COUNT I
## (FSLA – RETALIATORY TERMINATION & FAILURE TO PAY WAGES)
### 29 U.S.C. §201 *et seq.*
### PLAINTIFF v. DEFENDANT LEGEND SPINE

53.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

54.     As set forth more fully above, Plaintiff sought payment of wages or equity in exchange for the work that she performed for Legend Spine over the course of six months.

55.     When Legend Spine refused to compensate Plaintiff, Plaintiff reported to Legend Spine that she believed the conduct to be improper and unlawful.

56.     Instead of compensating Plaintiff, Legend Spine terminated Plaintiff as retribution and retaliation for engaging in protected activity in direct violation of 29 U.S.C. § 215, et seq.

57.     Further, Legend Spine failed to pay Plaintiff the wages that she earned and/or was entitled after terminating her employment.

58.     As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by Legend Spine, Plaintiff sustained permanent and irreparable harm, resulting in the loss of her employment, loss of earnings plus the value of certain benefits.

59.     Legend Spine's failure to compensate Plaintiff was knowing and purposeful.

60.     Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Legend Spine had no good faith basis to contest or dispute Plaintiff's right to receive compensation from Legend Spine.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Legend Spine, compensating her with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subject of unlawful retaliation, including an award of back pay, front pay, and pre-and post judgement interest, plus costs of suit and attorney and expert fees as allowed by law.  Plaintiff further demands liquidated damages under the FLSA and to the extent available, costs of suit and reasonable attorneys' fees.

## COUNT II
### (FSLA – FAILURE TO PAY WAGES)
### 29 U.S.C. §201 *et seq.*
### PLAINTIFF v. DEFENDANT ARGOVIAN

61.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

62.     As set forth more fully above, Plaintiff sought payment of wages in exchange for the work that she performed for Argovian that was due and owing to her for 2016 – which Defendant repeatedly promised to pay, but suddenly refused – and wages from August through November of 2018.

63.     Argovian failed to pay Plaintiff the wages that she earned and/or was entitled after terminating her employment.

64.     As a direct result of the aforesaid unlawful employment practices engaged in by Argovian, Plaintiff sustained permanent and irreparable harm, resulting in the loss of her employment, loss of earnings plus the value of certain benefits.

65.     Argovian's failure to compensate Plaintiff was knowing and purposeful.

66.     Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Argovian had no good faith basis to contest or dispute Plaintiff's right to receive compensation from Argovian.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Argovian, compensating her with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been terminated for Argovian's failure to compensate her, including an award of back pay, front pay, and pre-and post judgement interest, plus costs of suit and attorney and expert fees as allowed by law.  Plaintiff further demands liquidated damages under the FLSA and to the extent available, costs of suit and reasonable attorneys' fees.

**COUNT III**
**(PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW)**
**43 Pa. Cons. Stat. Ann § 260.1 *et seq.***
**PLAINTIFF v. DEFENDANTS LEGEND SPINE, DR. CHRISTOPHER WAGENER,**
**STEVEN MARINELLI,  EDWARD KARPOWICZ, AND MICHAEL BLACK**

67.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

68.     Pursuant to Pennsylvania's Wage Payment and Collection Law ("WPCL"), every employer is obligated to pay all wages and wage supplements due to its employees. 43 Pa. Cons. Stat. Ann. § 260.3.

69.     Pursuant to the WPCL, an employer includes but is not limited to, "every person, firm or partnership, association, corporation receiver or . . . any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." *Id.,* at 260.2a.

70.     Pursuant to the WPCL, wages include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term 'wages' also includes fringe benefits or wage supplements." *Id.*

71.     Pursuant to the WPCL, wage supplements include "any other amount to be paid pursuant to an agreement to the employee."  *Id.*

72.     As set forth fully above, Plaintiff and Legend Spine had an agreement whereby Plaintiff worked without immediate compensation in exchange for either interest in Legend Spine, or compensation at her rate of pay at a later time.

73.     Plaintiff accepted the terms of this employment agreement and worked for more than six months in accordance with these terms.

74.     Accordingly, Plaintiff's wage supplements include the oral agreement between the parties for Defendants to pay Plaintiff either her hourly rate on a deferred basis, with interest or an

11

equity stake in Legend Spine. *See Hartman v. Baker*, 766 A.2d 347 (Pa. Super. Ct. 2000) (holding that an equity interest provided to an employee in exchange for a reduction in salary constitutes "wages" as defined by the WPCL).

75.    Defendant, Legend Spine is an "employer" pursuant to the WPCL, as it does business and employs people in the Commonwealth.

76.    Defendants' unlawful withholding of Plaintiff's compensation constitutes a violation of the WPCL.

77.    Furthermore, pursuant to Pa. Cons. Stat. Ann. § 260.2 *et seq.,* and *Faden v. deVitry,* 625 A.2d 1236, 1239 (Pa. Super. Ct. 1993), any agent of Legend Spine who participated in refusing to pay Plaintiff's wages and/or wage supplements is ***personally liable*** under the WPCL.

78.    With the exception of her husband who campaigned for his wife to be paid by the company but was ignored, Defendants, the Legend Spine Shareholders, personally participated in the decision to withhold wages and/or wage supplements from Plaintiff.

79.    Defendant Legend Spine, at the direction of Defendants, the Legend Spine Shareholders, failed to pay Plaintiff her wages and/or wage supplements.

80.    Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Defendants had no good faith basis to contest or dispute Plaintiff's right to receive compensation from Legend Spine.

81.    Accordingly, pursuant to the WPCL, Plaintiff is also entitled to attorneys' fees and liquidated damages of 25% and all Defendants are ***personally*** liable for Plaintiff's wages, attorneys' fees and statutory liquidated damages. 43 Pa. Cons. Stat. Ann. §§ 260.9(a), 260.10.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, Legend Spine, Dr. Christopher Wagener, Steven Marinelli, Edward Karpowicz, and Michael Black, including an award of back pay, front pay, and pre-and post judgement interest, along with

liquidated damages of 25%, attorneys' fees, and any such other relief this Court deems equitable and just.

**COUNT IV**
**(PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW)**
**43 Pa. Cons. Stat. Ann § 260.1 *et seq.***
**PLAINTIFF v. DEFENDANTS ARGOVIAN, STEVEN MARINELLI,  EDWARD KARPOWICZ, AND MICHAEL BLACK**

82.    Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

83.    Pursuant to Pennsylvania's Wage Payment and Collection Law ("WPCL"), every employer is obligated to pay all wages and wage supplements due to its employees. 43 Pa. Cons. Stat. Ann. § 260.3.

84.    Pursuant to the WPCL, an employer includes but is not limited to, "every person, firm or partnership, association, corporation receiver or . . . any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." *Id.,* at 260.2a.

85.    Pursuant to the WPCL, wages include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term 'wages' also includes fringe benefits or wage supplements." *Id.*

86.    Pursuant to the WPCL, wage supplements include "any other amount to be paid pursuant to an agreement to the employee." *Id.*

87.    As set forth fully above, Plaintiff and Argovian had an agreement whereby Plaintiff worked without immediate compensation in 2016, under the promise that she would be paid when the company generated enough cash flow to compensate her at her rate of pay at a later time.

88.    Plaintiff accepted the terms of this employment agreement and worked for more than six months in 2016 accordance with these terms.

89.     Between 2016 and 2018, Argovian and its shareholders repeatedly represented that the funds due from 2016 would be paid to Plaintiff.

90.     Although Argovian paid Plaintiff in accordance with the terms of her employment between January 2017 and July 2018, Argovian ceased paying Plaintiff in August of 2018.

91.     Plaintiff continued to work for Argovian expecting that she would receive the past due payments, for 2018 and 2016.

92.     However, Argovian refused to make those payments to Plaintiff.

93.     Accordingly, Plaintiff's wage supplements include the oral agreement between the parties for Defendants to pay Plaintiff her hourly rate on a deferred basis, with interest.

94.     Defendant, Argovian is an "employer" pursuant to the WPCL, as it does business and employs people in the Commonwealth.

95.     Defendants' unlawful withholding of Plaintiff's compensation constitutes a violation of the WPCL.

96.     Furthermore, pursuant to Pa. Cons. Stat. Ann. § 260.2 *et seq.,* and *Faden v. deVitry,* 625 A.2d 1236, 1239 (Pa. Super. Ct. 1993), any agent of Argovian who participated in refusing to pay Plaintiff's wages and/or wage supplements is ***personally liable*** under the WPCL.

97.     With the exception of her husband who campaigned for his wife to be paid by the company but was ignored, Defendants, the Argovian Shareholders, personally participated in the decision to withhold wages and/or wage supplements from Plaintiff.

98.     Defendant Argovian, at the direction of Defendants, the Argovian Shareholders, failed to pay Plaintiff her wages and/or wage supplements.

99.     Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Defendants had no good faith basis to contest or dispute Plaintiff's right to receive compensation from Argovian.

100.     Accordingly, pursuant to the WPCL, Plaintiff is also entitled to attorneys' fees and liquidated damages of 25% and all Defendants are ***personally*** liable for Plaintiff's wages, attorneys' fees and statutory liquidated damages. 43 Pa. Cons. Stat. Ann. §§ 260.9(a), 260.10.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, Argovian, Steven Marinelli, Edward Karpowicz, and Michael Black, including an award of back pay, front pay, and pre-and post judgement interest, along with liquidated damages of 25%, attorneys' fees, and any such other relief this Court deems equitable and just.

**COUNT V**
**(UNJUST ENRICHMENT)**
**PLAINTIFF v. ALL DEFENDANTS**

101.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

102.     Plaintiff conferred upon Defendants Argovian and Legend SPine the benefits of Plaintiff's sweat equity, financial / bookkeeping expertise, and work product.

103.     At all times material hereto, in conferring these benefits on Defendants, Plaintiff acted in reliance on the promise that she would be compensated for her efforts.

104.     Defendants received such benefits.

105.     Defendants sought to unlawfully, and without paying fair market value, retain these benefits for themselves.

106.     Defendants' retention of these benefits, without payment of value to Plaintiff, is inequitable.

**WHEREFORE**, Plaintiff demands judgment in her favor and against all Defendants, including an award of back pay, front pay, and pre-and post judgement interest, along with any such other relief this Court deems equitable and just.

Respectfully Submitted,

**BOCHETTO & LENTZ, P.C.**

Date: August 15, 2019

By:   ___/s/ Bryan R. Lentz_____

By:     Bryan R. Lentz, Esquire
        Anton Kaminsky, Esquire
*Attorneys for Plaintiff*
Attorney I.D. No. 71383, 322660
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
(215) 735-2455 fax
blentz@bochettoandlentz.com
akaminsky@bochettoandlentz.com

16

# EXHIBIT "A"

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

# LEGEND SPINE, LLC

## August 22, 2017

THE MEMBERSHIP INTERESTS DESCRIBED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS, AND THE TRANSFERABILITY OF THE MEMBERSHIP INTERESTS THEREFORE IS RESTRICTED.  THE MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE HEREOF BE RECOGNIZED AS HAVING AN INTEREST IN SUCH MEMBERSHIP INTERESTS BY THE COMPANY FOR ANY PURPOSE, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AS AMENDED, WITH RESPECT TO SUCH MEMBERSHIP INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS OR (2) THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF THE COMPANY AND ITS COUNSEL.

THE MEMBERSHIP INTERESTS DESCRIBED IN THIS LIMITED LIABILITY COMPANY AGREEMENT ARE SUBJECT TO FURTHER RESTRICTION AS TO THEIR SALE, TRANSFERABILITY, OR ASSIGNMENT AS MORE FULLY DESCRIBED HEREIN AND AGREED TO BY EACH MEMBER.  SAID RESTRICTION PROVIDES, AMONG OTHER THINGS, THAT NO VENDEE, TRANSFEREE, OR ASSIGNEE SHALL BECOME A SUBSTITUTE MEMBER WITHOUT THE CONSENT OF THE MEMBERS.

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## Legend Spine, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT ("**Agreement**" or "**LLC Agreement**") is made, adopted and is effective as of August 22, 2017 (the "**Effective Date**"), by and among those Persons who have executed a counterpart of this Agreement as the members of a limited liability company formed under the Pennsylvania Uniform Limited Liability Company Act of 2016. All initially capitalized terms used in this Agreement, including the terms used above and in the Recitals below, shall have the meanings set forth in **Section 1.2** hereof (which definitions shall be controlling).

## R E C I T A L S :

WHEREAS, the Company was formed for the purposes set forth herein; and

WHEREAS, in accordance with the Act, each Member desires to enter into this Agreement to set forth the respective rights, powers and interests of the Members and to provide for the management and governance of the business and affairs of the Company.

NOW, THEREFORE, in consideration of the premises, promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND RULES OF CONSTRUCTION

### 1.1    Rules of Construction

.  As used in this Agreement: all financial terms used but not defined in this Agreement shall have the meanings accorded to them under GAAP; unless otherwise specified, all defined terms in the singular shall have comparable meanings when used in the plural and vice-versa; all pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require; the words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not any particular provision of this Agreement; the words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation," whether or not such phrase is included therein; unless otherwise specified in the computation of a period of time from a date to a later specified date, the word "from" means "from and including," and the words "to" and "until" each mean "to but excluding"; and  references to all documents, contracts, agreements or instruments shall include any and all supplements and amendments thereto.

### 1.2    Definitions

.  Subject to the provisions of **Section 1.1** above, the following initially capitalized terms used in this Agreement are defined as follows (any initially capitalized terms used in this

Agreement that are not defined in this **Section 1.2** shall have the meanings set forth in the body of this Agreement):

"**Act**" means the Pennsylvania Uniform Limited Liability Company Act of 2016, as set forth in 15 Pa.C.S. § 8811 *et seq*, as amended from time to time (or any corresponding provisions of succeeding law).

"**Additional Membership Interest**" means additional Membership Interests (including new classes or series thereof having rights which are different than the rights of any thenexisting class or series); obligations, evidences of indebtedness or other securities or interests convertible into or exchangeable for Membership Interests or Membership Equivalents; and Membership Equivalents.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments: credit to such Capital Account any amounts which such Member is obligated to restore, pursuant to any provision of this Agreement, or is deemed to be obligated to restore pursuant to the penultimate sentences of § 1.704-2(g)(1) and § 1.704-2(i)(5) of the Regulations; and debit to such Capital Account the items described in § 1.704-1(b)(2)(ii)(d)(4), § 1.704-1(b)(2)(ii)(d)(5), and § 1.704-1(b)(2)(ii)(d)(6) of the Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of § 1.7041(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"**Affiliate**" means, with respect to any Person, any Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such Person; any officer, director, general partner, member (if such Person is a member managed limited liability company), manager (if such Person is a manager-managed limited liability company) or trustee of such Person; or any Person who is an officer, director, general partner, member (if such Person is a member managed limited liability company), manager (if such Person is a manager managed limited liability company) or trustee of any Person described in clauses (i) or (ii) of this definition. For purposes of this definition, the term "controls," "is controlled by" or "is under common control with" shall mean the possession, directly or indirectly through one or more intermediaries, of the power to (y) direct or cause the direction of the management and policies of a Person, whether through the ownership of voting interests, by contract or otherwise, or (z) elect at least fifty percent (50%) of the directors or managers or Persons exercising similar authority with respect to such Person.

"**Agreement**" or "**LLC Agreement**" means this Limited Liability Company Agreement, as amended from time to time.

"**Allocation Year**" means the Fiscal Year or any portion thereof for which the Company is required to allocate Profits, Losses and other items of the Company's income, gain, loss or deduction pursuant to **Article 4** hereof.

"**Applicable Law**" means, with respect to any Person, any law, statute, treaty, rule or regulation or determination of an arbitrator, court or other statutes, laws, rules, regulations

3

and orders of any Governmental Authority applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Assignee Interest**" means an interest in the Company comprised solely of Financial Rights held by an Interest Holder.

"**Bankruptcy**" means, with respect to any Person, the occurrence of any of the following events:  such Person makes an assignment for the benefit of creditors;  such Person files a voluntary petition in bankruptcy;  such Person is adjudged bankrupt or insolvent, or has entered against him an order for relief in any bankruptcy or insolvency proceeding;  such Person files a petition or answer by the Person seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any Applicable Law; such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding for reorganization or of a similar nature;  such Person seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such Person or of all or any substantial part of his properties; or  one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any Applicable Law if the proceeding has not been dismissed, or if within ninety (90) days after the appointment, with or without such Person's consent or acquiescence, of a trustee, receiver or liquidator of such Person or all or any substantial portion of his properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay the appointment is not vacated.

"**Base Rate**" means, for each calendar month, the highest rate reported in the Money Rates section of *The Wall Street Journal* published on the second Business Day of that month as having been the rate in effect for corporate loans at large United States money center commercial banks (whether or not such rate has actually been charged by any such bank) as of the first calendar day of such month.  If *The Wall Street Journal* ceases the publication of such rate, the "**Base Rate**" shall mean the "prime" or "base" rate announced by Citibank, N.A., New York (whether or not such rate has actually been charged by such bank).  If such bank discontinues the practice of announcing such rate, the "**Base Rate**" shall mean the highest rate charged by such bank on short-term, unsecured loans to its most creditworthy large corporate borrowers.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which national banks located in Pottstown, Pennsylvania are authorized or obligated to close their regular banking business.

"**Capital Account**" has the meaning set forth in **Section 3.6** hereof.

"**Capital Contributions**" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Membership Interest held by such Person; provided, however, in accordance with § 1.704-(b)(2)(iv)(d)(2) of the Regulations, the principal amount of any promissory note contributed to the Company by the maker of such note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of such note or

until, and to the extent, principal payments are made thereon, unless such note is readily traded on an established securities market.

"**Cash Available For Distribution**" means, for any period, the amount, if any, by which the Company's total cash funds on hand exceeds the current and anticipated needs of the Company to utilize such funds to pay or create reserves for:   expenses or expenditures related to the Company's business operations;  expenses, expenditures, advances or investments made or incurred in connection with any new or additional business activity undertaken by the Company; payments of the principal and interest due in respect of indebtedness for which the Company is obligated;  capital improvements, replacements, and contingencies; and  any other actual cost or expenditure incurred for the benefit of the Company.  The amount, if any, of Cash Available For Distribution and the time of said distribution shall be determined by a unanimous decision of the Class A Members.

"**Certificate**" means the certificate of organization of the Company as filed with the office of the Pennsylvania Department of State, as amended or restated from time to time.

"**Class**" means class of Membership Interest and may refer to Class A and/or B Membership Interests as appropriate.

"**Class A Member**" means any Person (i) whose name is set forth on the Unit Ownership Ledger who has become a Class A Member, pursuant to the terms of this Agreement; and (ii) who is the owner of a Class A Membership Interest.  "**Class A Members**" means all such Persons.

"**Class A Membership Interest**" means, with respect to each Class A Member, such Class A Member's interest in the Company including any and all rights and benefits to which a Class A Member may be entitled as provided in this Agreement, together with all obligations of a Class A Member to comply with the terms and provisions of this Agreement. The Class A Membership Interest of any Member at any time may be expressed as a percentage, which shall be determined by the ratio which the Class A Membership Interest held by such Member bears to the total Class A Membership Interests held by all the Class A Members.  Such Class A Membership Interest includes, without limitation: (i) the Governance Rights of a Class A Member, (ii) the Financial Rights of a Class A Member, and (iii) the right of a Class A Member to Transfer Governance Rights or Financial Rights to the extent permitted under this Agreement.

"**Class B Member**" means any Person (i) whose name is set forth on the Unit Ownership Ledger who has become a Class B Member, pursuant to the terms of this Agreement; and (ii) who is the owner of a Class B Membership Interest.  "**Class B Members**" means all such Persons.

"**Class B Membership Interest**" means, with respect to each Class B Member, such Class B Member's interest in the Company including any and all rights and benefits to which a Class B Member may be entitled as provided in this Agreement, together with all obligations of a Class B Member to comply with the terms and provisions of this Agreement. The Class B Membership Interest of any Member at any time may be expressed as a percentage,

which shall be determined by the ratio which the Class B Membership Interest held by such Member bears to the total Class B Membership Interests held by all the Class B Members. Such Class B Membership Interest includes, without limitation: (i) the Financial Rights of a Class B Member, and (iii) the right of a Class B Member to Transfer Financial Rights to the extent permitted under this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Company**" means the limited liability company formed under this Agreement pursuant to the Act and any limited liability company continuing the business of the Company in the event of dissolution as herein provided.

"**Company Minimum Gain**" has the same meaning as the term "partnership minimum gain" set forth in § 1.704-2(b)(2) of the Regulations and shall be determined in accordance with § 1.704-2(d) of the Regulations.

"**Company Property**" means all property of any kind, real or personal, tangible or intangible, which is owned by the Company or in which the Company has an interest.

"**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Company.

"**Dissolution Event**" has the meaning set forth in **Section 15.1** hereof.

"**Effective Date**" has the meaning set forth in the preamble.

"**Financial Rights**" means a Member's rights to  share in Profits and Losses, and share in and receive distributions, and  Transfer Financial Rights.

"**Fiscal Year**" means the calendar year, and a Fiscal Year shall include any partial Fiscal Year at the beginning and end of the Company term.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America from time to time.

"**Governance Rights**" means  a Class A Member's right to vote,  all rights of a Member as a Class A Member in the Company other than Financial Rights and the right to assign Financial Rights, and  the right to Transfer Governance Rights.  For the avoidance of

doubt, only Class A Members shall have Governance Rights.  Class B Members shall have no Governance Rights.

**Governance Documents**" means, as to any Person, such Person's certificate of incorporation, charter, certificate of formation, articles of organization, certificate of limited partnership, bylaws, operating agreement, limited liability company agreement, partnership agreement, limited partnership agreement, or any other document evidencing the formation of such Person or that otherwise govern the business and affairs or management of such Person.

**Governmental Authority**" means any foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, court, government or self-regulatory organization, commission, tribunal, organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"**Gross Asset Value**" has the meaning set forth in **Section 4.10** hereof.

"**Interest Holder**" means a Person who holds an Assignee Interest and either has not become a Member of the Company; or  such Person's Membership Interest has been terminated (regardless of the event that terminates the continued Membership Interest of such Member).  An Interest Holder shall be entitled to the allocations and distributions attributable to the Assignee Interest held by him and shall be required to make any Capital Contributions to be made in respect of such Assignee Interest; however, such Interest Holder shall have no right to participate in the management of the Company or otherwise to be treated as a Member.  Without limiting the generality of the foregoing, an Interest Holder:  (x) shall have no right to any information or accounting of the affairs of the Company, (y) shall not be entitled to inspect the books or records of the Company, and (z) shall not have any of the Governance Rights (voting or otherwise) of a Member under the Act or this Agreement.

"**Initial Capital Contributions**" has the meaning set forth in **Section 3.4** hereof.

"**Majority Vote**" means, with respect to actions taken by the Members, the affirmative vote or consent of Members holding more than fifty percent (50%) of the voting power then held by Members.  For purposes of this Agreement, the "voting power" of a Member shall be calculated as the number of Class A Units held by that Member.  Where the vote or consent concerns a matter on which a Member cannot vote in accordance with the terms of this Agreement or Applicable Law (other than the failure of such a Member to attend a meeting for such vote) the Members shall not include such Member (or the voting power held by such Member)in the calculation of  the voting power then held by Members or  the votes or consents with respect to such matter.

"**Member**" means any Person  whose name is set forth on Unit Ownership Ledger or who has become a Member pursuant to the terms of this Agreement; and  who is the owner of a Membership Interest.  "**Members**" means all such Persons.  All references in this Agreement to a majority in interest or a specified percentage of the Members shall mean Members holding more than fifty percent (50%) or such specified percentage, respectively, of the voting power then held by Members.

"**Member Nonrecourse Debt**" has the same meaning as the term "partner nonrecourse debt" set forth in § 1.704-2(b)(4) of the Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to each Member Nonrecourse Debt, an amount equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with § 1.704-2(i)(3) of the Regulations.

"**Member Nonrecourse Deductions**" has the same meaning as the term "partner nonrecourse deductions" set forth in § 1.704-2(i)(1) and § 1.704-2(i)(2) of the Regulations.

"**Membership Equivalents**" means rights, warrants, options, convertible securities, exchangeable securities, indebtedness or other rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, Membership Interests or securities exercisable for or convertible or exchangeable into Membership Interests, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"**Membership Interest**" means, with respect to each Member, such Member's interest in the Company including any and all rights and benefits to which a Member may be entitled as provided in this Agreement, together with all obligations of a Member to comply with the terms and provisions of this Agreement. The Membership Interest of any Member at any time shall be expressed as a percentage, which shall be determined by the ratio that the number of Units held by such Member bears to the total number of Units held by all the Members. Such Membership Interest includes, without limitation: the Governance Rights, if any, of a Member, the Financial Rights of a Member, and the right of a Member, if any, to Transfer Governance Rights or Financial Rights to the extent permitted under this Agreement.

"**Nonrecourse Deductions**" has the meaning set forth in § 1.704-2(b)(1) of the Regulations.

"**Nonrecourse Liability**" has the meaning set forth in § 1.704-2(b)(1) of the Regulations.

"**Notice**" means any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement, which shall be in writing (the term "writing" shall include communications by facsimile, electronic mail or other electronic transmission) and shall be delivered as set forth in **Section 18.3** hereof.

"**Officers**" means each Officer appointed by the Class A Members in accordance with **Article 9** hereof. "**Officer**" means, individually, any such Person.

"**Ordinary Course of Business**" means an action taken by a Person only if: such action is consistent with the past practices, procedures, and customs of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person; if the Person is a corporation, partnership, limited liability company or any other entity of any nature, such action is not required to be authorized by the board of directors of such entity (or by any Person or group of Persons exercising similar authority) and is not required to be authorized by the equity owners of such entity; and such action is similar in nature and magnitude to actions

8

customarily taken in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business of such Person.  Unless the context indicates otherwise, any reference in this Agreement to "Ordinary Course of Business" shall mean and refer to the Ordinary Course of Business of the Company.

"**Permitted Transfer**" means any Transfer of the Membership Interest of a Member permitted under the terms of this Agreement.

"**Person**" means any individual or corporation, partnership, limited liability company, limited liability partnership, firm, association, joint venture, joint stock company, real estate investment trust, trust, estate, unincorporated organization, firm or any other form of entity, including a Governmental Authority.

"**Personal Representative**" means  with respect to any individual, such Person's heirs, legatees, legal representative, executor, successors, transferees, assigns or any other Person who succeeds to a Person's estate following such Person's death, legal incompetence or Bankruptcy and any transferee of such successor; and  with respect to any Person, other than an individual, such Person's successors, transferees, assigns or any other Person who succeeds to such Person's estate following such Person's dissolution or Bankruptcy or any transferee of such successor.

"**Profits**" and "**Losses**" has the meaning set forth in **Section 4.1** hereof.

"**Regulations**" means the Income Tax Regulations including Temporary Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" has the meaning set forth in **Section 4.7** hereof.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, or any similar federal statute, together with the rules and regulations promulgated thereunder, as the same are in effect from time to time.

"**Substitute Member**" means any Person admitted to the Company as a Member pursuant to **Article 14** hereof.

"**Taxing Authority**" means any Governmental Authority that levies and collects taxes, interest or penalties, however, designated, on the Company's income or gain (or on any Member's share of such income or gain).

"**Transfer**" means as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation or other disposition and, as a verb, to voluntarily or involuntarily transfer, sell, pledge, hypothecate or otherwise dispose of.  "**Transferred**" means to have sold, pledged, hypothecated or otherwise disposed of.  For avoidance of doubt, a Withdrawal shall not be considered a Transfer, even if the Withdrawing Member also Transfers his Membership in connection with any Withdrawal.

"**Unit**" means the Membership Interest of a Member, expressed numerically.

9

"**Unit Ownership Ledger**" means a ledger created and maintained by the Company setting forth the name of each Member, the Capital Contributions made by each Member and the number of each Class of Units held by each such Member. Upon any change in the number or ownership of outstanding Units (whether upon an issuance of Units, a Transfer of Units, a cancellation of Units or otherwise), the President or his designee shall amend and update the Unit Ownership Ledger to reflect such change. Absent manifest error, the ownership interests recorded on the Unit Ownership Ledger shall be the conclusive record of the Units that have been issued and are outstanding.

"**Withdrawal**" means the retirement, resignation, withdrawal, or any other event that voluntarily terminates the continued Membership Interest of a Member. "**Withdraw**" means to retire, resign, withdraw, or otherwise voluntarily terminate the continued Membership Interest of a Member. "**Withdrawing**" means the act of retiring, resigning, withdrawing, or otherwise voluntarily terminating the continued Membership Interest of a Member. Notwithstanding anything to the contrary contained herein, a Transfer, which shall be governed by the provisions of **Article 14** hereof, shall not be considered a Withdrawal, even if the Transfer terminates the continued Membership Interest of a Member.

## ARTICLE 2
## ORGANIZATION

### 2.1 Organization

. The Members hereby organize the Company as a limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

### 2.2 Adoption of LLC Agreement

. This Agreement is adopted and approved as the operating agreement of the Company and, together with the Certificate, this Agreement shall govern the business and affairs of the Company, the relationship among the Members and the rights and obligations of the Members.

### 2.3 Name

. The name of the Company shall be "Legend Spine, LLC," a Pennsylvania limited liability company. All business of the Company shall be conducted in such name or any other name adopted by the Class A Members in accordance with the Act.

### 2.4 Purposes

. The business of the Company is to: provide engineering design of medical implantable fusion devices; seek ISO and FDA approval for such medical devices; provide philanthropic activities to the local community and medical industry; acquire by purchase, subscription, underwriting or otherwise, and to own, hold for investment, or otherwise, and to use, sell, assign, transfer, mortgage, create security interests in, pledge, exchange or otherwise dispose of any and all types of property (or any interest therein, directly or indirectly) of any type, nature or kind, real or personal, tangible or intangible (including, without limitation, interests in partnerships, limited liability companies, joint ventures, proprietorships, and other business entities, stock,

options, warrants, bonds, debentures, notes, script, securities, evidences of indebtedness, contracts, or obligations of any Person), and to issue in exchange therefor stocks, bonds, other securities, evidences of indebtedness of the Company or other consideration of any type, nature or description; and  do any and all things and exercise any and all powers necessary to, connected with or incidental to the accomplishment or furtherance of any of the foregoing or which is necessary to, connected with or incidental to the protection and benefit of the Company; provided, however, except as specifically limited in this **Section 2.4** or the Certificate, the Company may engage in any and all other business activities whatsoever that may lawfully be conducted by limited liability companies under the Act, and the Company may exercise all powers necessary to, connected with or incidental to the accomplishment of any business that may lawfully be conducted by limited liability companies under the Act.

### 2.5     Duration

. The date of formation and commencement of existence of the Company shall be the effective date specified in the Certificate.  Except as provided in **Section 15.1** hereof, the existence of the Company shall be perpetual.

### 2.6     Principal Office; Registered Office and Registered Agent

..

    (a)     The principal office or principal executive office of the Company shall be 1803 Apple Tree Lane, Bethlehem, Pennsylvania 18015, or such other location as the Class A Members may designate from time to time.

    (b)     The registered office of the Company in the State of Pennsylvania shall be the initial registered office named in the Certificate or such other location as the Class A Members may designate from time to time.

    (c)     The registered agent of the Company in the State of Pennsylvania shall be the initial registered agent named in the Certificate or such other Person as the Class A Members may designate from time to time.

### 2.7     Filings

.

    (a)     The Class A Members are authorized to and shall cause to be filed in the office of the Secretary of State of the State of Pennsylvania such certificates, documents, instruments and publications as may be required by Applicable Law to perfect and maintain the status of the Company as a limited liability company under the Applicable Laws of the State of Pennsylvania.

    (b)     The Company shall not conduct business in any state or jurisdiction outside the State of Pennsylvania, unless the Company shall have first satisfied the requirements imposed by the Applicable Law of such other state or jurisdiction relating to the registration or qualification of foreign limited liability companies doing business in

such other state or jurisdiction. The Class A Members are authorized to and shall cause the Company to execute and file such certificates, documents, instruments and publications as may be reasonably necessary to perfect and maintain the status of the Company as a foreign limited liability company under the Applicable Laws of any state or jurisdiction in which the Company engages in business.

**2.8     No State Law Partnership**

. The Company shall not be a partnership or joint venture under any Applicable Law, and no Member shall be a partner or joint venturer of any other Member for any purposes, and this Agreement may not be construed otherwise; provided, however, the Company intends to and shall be classified as a partnership for purposes of the Code and other Applicable Law of any Taxing Authority.

**2.9     Title to Company Property**

. All Company Property shall be owned by the Company as an entity, and no Member shall have any ownership interest in or right to such Company Property in his individual name. Except as otherwise provided in this Agreement, all of the Company Property shall be held in the name of the Company and not in the name of any Member.

**2.10    Payment of Individual Obligations**

. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for or in payment of any individual obligation of any Member.

**ARTICLE 3**
**MEMBERS AND CAPITAL CONTRIBUTIONS**

**3.1     Membership Interests**

(a)     The Membership Interests in the Company shall be divided into and represented by Units. There shall be two (2) classes of Units: the Class A and B Units; and all references in this Agreement to "**Units**" shall include all Units outstanding as of the relevant date. The Company shall be authorized to issue a total of a total of up to 8,000 Class A Units and 2,000 Class B Units; provided, however, that the Company may authorize additional Class A or B Units in such amounts as determined by the Class A Members.

(b)     The holders of the Class A and Class B Units shall have the Financial Rights set forth in this Agreement.     The holders of the Class A Units shall have the Governance Rights set forth in this Agreement.     The voting power of each Class A Member shall be computed as the number of Class A Units held by such Member.     At no time shall holders of Class B Units have Governance Rights.

12

### 3.2    Members

.

(a)    The name, residence, business or mailing addresses, amount of Capital Contributions, if any, and the type and number of Units of each Member are set forth on the Unit Ownership Ledger, as amended from time to time in accordance with the terms of this Agreement. Any reference in this Agreement to the Unit Ownership Ledger shall be deemed to be a reference to the Unit Ownership Ledger as amended and in effect from time to time in accordance with the terms of this Agreement. Each Person listed on the Unit Ownership Ledger upon  his or its  execution of this  Agreement or counterpart thereto and   receipt (or deemed receipt) by the Company of such Person's Capital Contributions as set forth on the Unit Ownership Ledger, if any, is hereby admitted to the Company as a Member of the Company.

(b)    *Amendment of Unit Ownership Ledger.*  Upon receipt of any Capital Contributions (including, without limitation, pursuant to a Capital Call), if any, the Unit Ownership Ledger shall be amended or updated by the President at any time to reflect each Member's total Capital Contributions and number and Class of Units.

### 3.3    Additional Members or Membership Interests

. Additional Members may be admitted or Additional Membership Interests issued only if the admission of such additional Member is made pursuant to **Section 14.7** hereof, or  all of the terms and conditions of the admission of such Person is otherwise approved by the unanimous vote of the Class A Members.

### 3.4    Capital Contributions

. Except as otherwise expressly provided in this Agreement, in any other agreement among the Class A Members or as required by Applicable Law, a Member shall not be required to lend funds to the Company or to make any Capital Contributions to the Company.

### 3.5    Capital Accounts

.

(a)    The Company shall establish and maintain a separate capital account ("**Capital Account**") for each Member.  The Capital Account of each Member shall be determined and adjusted in accordance with the following provisions:

(i)    Each Person's Capital Account will be credited with:  (A) the amount of cash and the initial Gross Asset Value of any other property contributed to the Company by such Person as Capital Contributions, (B) such Person's distributive share of Profits and any items in the nature of income or gain which are specially allocated to such Person pursuant to **Section 4.6** or **4.7** hereof,

13

and (C) the amount of any Company liabilities assumed by such Person or which are secured by any of the Company Property distributed to such Person.

(ii)     Each Person's Capital Account will be debited with: (A) the amount of cash and the Gross Asset Value of any of any other Company Property distributed to such Person pursuant to any provision of this Agreement, (B) such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated to such Person pursuant to **Section 4.6** or **4.7** hereof, and (C) the amount of any liabilities of such Person assumed by the Company or which are secured by any property contributed by such Person to the Company.

(iii)     If any interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the Transferred interest, and a separate Capital Account shall thereafter be maintained for such transferee.

(b)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with § 1.704-1(b) of the Regulations, and such provisions shall be interpreted and applied in a manner consistent with such Regulations. If the Company determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Regulations, the Company may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to **Article 15** hereof upon the dissolution of the Company. The Company also may  make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with § 1.7041(b)(2)(iv)(g) of the Regulations, and  make any appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with § 1.704-1(b) of the Regulations. In determining the amount of any liability for purposes of **Sections 3.6(a)(i)** and **(ii)** above, the provisions of § 752(c) of the Code and any other applicable provisions of the Code and Regulations shall be taken into account.

(c)     At any time that the balance of a Member's Capital Account is required to be determined under any provision of this Agreement, such balance shall be determined using the method of accounting used by the Company for federal income tax purposes.

**3.6     Other Matters**

.

(a)     Except as otherwise expressly provided in this Agreement, no Member shall demand or receive a return of his Capital Contributions without the consent of all

the Class A Members.   Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash in return for such Member's Capital Contributions.

(b)   Except as otherwise expressly provided in this Agreement, no Member shall receive any interest, salary, or drawing with respect to his Capital Contributions or his Capital Account or for services rendered on behalf of the Company or otherwise in his capacity as a Member.

### 3.7   Additional Funds

.  The Members recognize that the Company may require additional funds to pay the costs of conducting its business.  If the Class A Members determine that additional funds are required to pay such costs, the additional funds may be obtained by  utilizing any reserves established by the Company;  obtaining a loan from third parties, provided the terms thereof are approved as required in **Section 6.3(a)** hereof; or  loans from one or more of the Members in accordance with **Section 6.9(d)** hereof.


# ARTICLE 4
# ALLOCATIONS

### 4.1   Determination of Profits and Losses

.  "**Profits**" and "**Losses**" means, for each Allocation Year, an amount equal to the Company's taxable income or loss for such Allocation Year, determined in accordance with § 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to § 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments, without duplication:

(a)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this **Section 4.1** shall be added to such taxable income or loss;

(b)   Any expenditures of the Company described in § 705(a)(2)(B) of the Code or treated as expenditures under § 705(a)(2)(B) of the Code pursuant to § 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this **Section 4.1**, shall be subtracted from such taxable income or loss;

(c)   If the Gross Asset Value of any item of Company Property is adjusted pursuant to **Section 4.10(b)** or **4.10(c)** hereof, the amount of such adjustment shall be taken into account as gain (if the adjustment increases the Gross Asset Value of the item of Company Property) or loss (if the adjustment decreases the Gross Asset Value of the item of Company Property) from the disposition of such item of Company Property for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from the disposition of any item of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company Property disposed of, notwithstanding that the adjusted tax basis of such item differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of "Depreciation";

(f)     To the extent that an adjustment to the adjusted tax basis of any item of Company Property pursuant to § 734(b) or § 743(b) of the Code is required pursuant to § 1.7041(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the item of Company Property) or loss (if the adjustment decreases the basis of the item of Company Property) from the disposition of such item of Company Property and shall be taken into account for purposes of computing Profits or Losses; and

(g)     Notwithstanding any other provision of this **Section 4.1**, any items that are specially allocated pursuant to **Sections 4.6** or **4.7** hereof shall not be taken into account in computing Profits or Losses.  The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to **Sections 4.6** and **4.7** hereof shall be determined by applying rules analogous to those set forth in **Sections 4.1(a)** through **(f)** above.

### 4.2     Allocation of Profits

. After giving effect to the special allocations set forth in **Sections 4.6** and **4.7** hereof, Profits for any Allocation Year shall be allocated among the Members proportionately based on the number of Units held by each Member on the first day of such Allocation Year.

### 4.3     Allocation of Losses

. After giving effect to the special allocations set forth in **Sections 4.6** and **4.7** hereof, and subject to the limitations set forth in **Section 4.5** below, Losses for any Allocation Year shall be allocated among the Members proportionately based on the number of Units held by each Member on the first day of such Allocation Year.

### 4.4     Change in Financial Rights

. Notwithstanding anything to the contrary contained in this **Article 4**, if the Financial Rights held by any Member changes during an Allocation Year for any reason, the allocations of Profits, Losses and items of income, gain, loss, and deduction shall be adjusted as necessary to reflect the varying Financial Rights of the parties during such Allocation Year.  Such adjustment shall be based on the proportion of the Allocation Year such Person held such Financial Rights;

16

provided, however, in the event of any significant transactions or uneven income or loss, the Class A Members may direct that a closing of the books method or a hybrid method be used.

### 4.5    Limitation on Losses

.    The Losses allocated pursuant to **Section 4.3** hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Allocation Year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to **Section 4.3** hereof, the limitation set forth in this **Section 4.5** shall be applied on a Member by Member basis so as to allocate the maximum permissible Loss to any Member under § 1.704-1(b)(2)(ii)(d) of the Regulations.

### 4.6    Special Allocations

.    The following special allocations shall be made in the following order:

(a)    *Minimum Gain Chargeback.*  Except as otherwise provided in § 1.704-2(f) of the Regulations, notwithstanding any other provision of this **Article 4**, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Person's share of the net decrease in Company Minimum Gain, determined in accordance with § 1.704-2(g) of the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto, and the items to be allocated shall be determined in accordance with §§ 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations.  This **Section 4.6(a)** is intended to comply with the minimum gain chargeback requirement in § 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)    *Member Nonrecourse Debt Minimum Gain Chargeback.*  Except as otherwise provided in § 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this **Article 4**, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Person who has a share of the Member Nonrecourse Debt Minimum Gain, determined in accordance with § 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with § 1.704-2(i)(4) of the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto, and the items to be allocated shall be determined in accordance with §§ 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations.  This **Section 4.6(b)** is intended to comply with the minimum gain chargeback requirement in § 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)     *Qualified Income Offset*.  In the event that any Member unexpectedly receives any adjustments, allocations, or distributions described in §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company gross income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, however, an allocation pursuant to this **Section 4.6(c)** shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this **Article 4** have been tentatively made as if this **Section 4.6(c)** was not in this Agreement.

(d)     *Gross Income Allocation*.  In the event any Member has a deficit Capital Account at the end of any Allocation Year which is in excess of the sum of the amount such Member is obligated to restore pursuant to any provision of this Agreement and the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of §§ 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of Company gross income and gain in the amount of such excess as quickly as possible; provided, however, an allocation pursuant to this **Section 4.6(d)** shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this **Article 4** have been made as if **Section 4.6(c)** hereof and this **Section 4.6(d)** were not in this Agreement.

(e)     *Nonrecourse Deductions*.  Nonrecourse Deductions for any Allocation Year or other period shall be allocated among the Members in proportion to the ratio of the Profits and Losses allocated to each Member to the total Profits and Losses allocated to all Members.

(f)     *Member Nonrecourse Deductions*.  Any Member Nonrecourse Deductions for any Allocation Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with § 1.704-2(i)(1) of the Regulations.

(g)     *§ 754 Adjustment*.  To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to § 734(b) or § 743(b) of the Code is required to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of his interest in the Company, pursuant to § 1.704-1(b)(2)(iv)(m)(2) or § 1.704-1(b)(2)(iv)(m)(4) of the Regulations, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in proportion to their interest in the Company if § 1.704-1(b)(2)(iv)(m)(2) of the Regulations applies, or to the Member to whom such distribution was made if § 1.704-1(b)(2)(iv)(m)(4) of the Regulations applies.

**4.7     Curative Allocations**

. The allocations set forth in **Section 4.5** and **Sections 4.6(a)** through **4.6(g)** hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this **Section 4.7**.    Therefore, notwithstanding any other provision of this **Article 4** (other than the Regulatory Allocations), the Company shall make offsetting special allocations of other items of Company income, gain, loss or deduction among the Members so that after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to **Sections 4.2, 4.3** and **4.8** hereof. Any elections or decisions relating to allocations made pursuant to this **Section 4.7** shall be made by the Class A Members and, in exercising his discretion under this **Section 4.7**, the Class A Members shall take into account future Regulatory Allocations under **Sections 4.6(a)** and **4.6(b)** that, although not yet made, are likely to offset other Regulatory Allocations previously made under **Sections 4.6(e)** and **4.6(f)** hereof.

**4.8     Other Allocations Rules.**

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses and any other items allocable to any period, shall be determined on a daily, monthly, or other basis, as determined by the Class A Members using any permissible method under § 706 of the Code and the Regulations promulgated thereunder.

(b)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, and deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

(c)     The Members are aware of the income tax consequences of the allocations made by this **Article 4** and hereby agree to be bound by the provisions of this **Article 4** in reporting their share of Company income and loss for income tax purposes.

(d)     To the extent permitted by § 1.704-2(h)(3) of the Regulations, the Company shall endeavor to treat distributions of Cash Available For Distribution as having been made from the proceeds of a Nonrecourse Liability only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

**4.9     Tax Allocations.**

(a)     In accordance with § 704(c) of the Code and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company

19

for federal income tax purposes and its initial Gross Asset Value (computed in accordance with **Section 4.10** hereof).

(b)     If the Gross Asset Value of any Company Property is adjusted pursuant to **Section 4.10** hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under § 704(c) of the Code and the Regulations promulgated thereunder.

(c)     Any elections or other decisions relating to such allocations shall be made by the Class A Members in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this **Section 4.9** are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing any Person's Capital Account or share of Profits, Losses, or other items or distributions pursuant to any provision of this Agreement.

**4.10     Adjustment of Gross Asset Value**

.   "**Gross Asset Value**" means, with respect to any item of Company Property, the adjusted basis of such item for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset on the date of the contribution, as determined by agreement of all the Class A Members;

(b)     The Gross Asset Values of all items of Company Property will be adjusted to equal their respective gross fair market values, as determined by the Class A Members as of the following times:   the acquisition of an additional Membership Interest by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; the distribution by the Company to a Member of more than a *de minimis* amount of the Company Property as consideration for an interest in the Company; and  the liquidation of the Company within the meaning of § 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, an adjustment described in clauses (i) and (ii) of this **Section 4.10(b)** shall be made only if the Class A Members reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Gross Asset Value of any item of Company Property distributed to any Member shall be adjusted to equal the gross fair market value of such item on the date of distribution; and

(d)     The Gross Asset Value of each item of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such items pursuant to § 734(b) or § 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to § 1.704-1(b)(2)(iv)(m) of the Regulations and **Section 4.1(f)** or **Section 4.6(g)** hereof; provided, however, the Gross Asset Values shall not be adjusted pursuant to this **Section 4.10(d)** to the extent that the Class A Members determine that an adjustment pursuant to **Section**

**4.10(b)** above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this **Section 4.10(d)**.

(e)     If the Gross Asset Value of an item of Company Property has been determined or adjusted pursuant to **Sections 4.10(a)**, **(b)** or **(d)** above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such item for purposes of computing Profits or Losses.

## ARTICLE 5
## DISTRIBUTIONS

**5.1     Cash Available For Distribution**

.  Except as otherwise provided in **Section 15.3** hereof with respect to the dissolution of the Company, Cash Available For Distribution, if any, shall be distributed, at such times as the Class A Members shall determine, among the Members proportionately based on the number of Units held by each Member; provided, however, that if the number of Units held by any Member changes during any Allocation Year, Cash Available For Distribution for such Allocation Year shall be allocated among the Members by taking into account their varying interests during such Allocation Year using any conventions permitted by Applicable Law and selected by the Class A Members.  Notwithstanding the foregoing, Members that are physicians will not be entitled to Company distributions of any profits generated by the  sale, distribution, implantation, or use of any Company products by or to that Member, any physician in that Member's group practice, or any hospital or healthcare facility in which such Member holds medical staff privileges.  The Class A Members may from time to time elect to distribute property in lieu of or in addition to cash, and any such property shall be distributed in the same proportion as provided in this **Section 5.1** with respect to Cash Available For Distribution.  The Class A Members will unanimously agree on the amount of earnings to be retained by the Company.

**5.2     Amounts Withheld**

.  All amounts withheld pursuant to the Code or the Applicable Laws of any Taxing Authority with respect to any payment or distribution to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this **Article 5** for all purposes under this Agreement.  The Company is authorized to withhold from distributions to the Members and to pay over to any Taxing Authority any amounts required to be so withheld pursuant to the Code, the Regulations or any provision of any other Applicable Law and shall allocate such amount to the Member with respect to which such amount was withheld.

**5.3     Limitation on Distributions**

(a)     The Company shall make no distributions to the Members except  as provided in this **Article 5** and **Section 15.3** hereof, or  as otherwise agreed to by all of the Class A Members.

(b)     No distribution may be made by the Company if, after giving effect to the distribution, the Company's total assets would be less than its total liabilities, other than liabilities to Members on account of their Membership Interest and  any liability for which the recourse of creditors is limited to specified Company Property.   The fair market value of any asset that is subject to a liability for which the recourse of creditors is limited to such asset shall be included in the assets of the Company only to the extent that the fair market value thereof exceeds the liability to which such asset is subject.

(c)     The effect of a distribution under **Section 5.3(b)** hereof shall be determined as of  the date on which the distribution is authorized, if payment of the distribution occurs not later than four (4) months following the date on which such distribution was authorized; or  the date on which the distribution is paid, if payment is made more than four (4) months after the date on which such distribution was authorized.

**ARTICLE 6**
**MANAGEMENT; RIGHTS, POWERS AND DUTIES OF MEMBERS**

**6.1     Management by Class A Members**

. The business and affairs of the Company shall be managed by or under the direction of the Class A Members, and all powers of the Company shall be exercised by or under the direction of the Class A Members.  Notwithstanding the foregoing, to the extent that the Class A Members deem it reasonably necessary or desirable to promote the business goals and objectives of the Company or to the extent provided in this Agreement, the Class A Members may delegate all or part of their duties and responsibilities to the Officers; and such Officers shall have the power and authority to manage and direct the business and affairs to the extent authorized by the Class A Members, pursuant to this Agreement or otherwise.

**6.2     Authority of the Class A Members**

. Except as otherwise provided herein, each Class A Member has the right, power and authority to manage the business and affairs of the Company and shall have all of the rights and powers which may be possessed by members of a limited liability company under the Act.  Each Class A Member is an agent of the Company for the purpose of its business and, except as otherwise provided herein, the act of each Class A Member, including the execution of any instrument in the name of the Company, for apparently carrying on of the usual and customary business of the Company, binds the Company, unless the Class A Member so acting has no authority to act for the Company in the particular matter, and the Person with whom the Class A Member is dealing has knowledge of the Class A Member's lack of authority.

**6.3     Restriction on Authority of Members**

. The authority of the Members is limited as follows:

(a)     Class B Members have no Governance Rights.

(b)     Without the unanimous consent of the Class A Members, no Member (nor any Officer acting under the direction of any Member) shall have the authority to, and

22

each Member covenants and agrees that he shall not do any of the following acts:  borrow or lend money of the Company;  possess Company Property, or assign rights in specific Company Property, for other than a Company purpose;  conduct business in a manner contrary to the expense policies of the Company;  or  do any act which would make it impossible to carry on or continue the ordinary business of the Company.

(c)     Without the consent of the Class A Members by Majority Vote, no Member (nor any Officer acting under the direction of any Member) shall have the authority to, and each Member covenants and agrees that he shall not do any of the following acts:  sell or otherwise dispose of at one time all or substantially all of the Company Property, except for a liquidating sale of Company Property in connection with the dissolution of the Company;  cause the Company to enter into or terminate Property Lease Agreements;  cause the Company enter into any Partnership Agreement;  borrow funds on behalf of the Company or pledge, mortgage or otherwise encumber any Company Property;  cause the Company to issue or sell and securities or to effect any merger, consolidation, reorganization, business combination, recapitalization or similar action;  confess a judgment against the Company;  release or compromise any claim or debt of the Company;  submit a claim by or against the Company to arbitration or reference;  cause the Company to voluntarily take any action that would cause a Bankruptcy of the Company;  cause the Company to enter into any transaction with a Member or any Affiliate thereof;  cause the Company to employ or terminate employment of an employee of the Company;  cause the Company to engage into or terminate a client relationship;  remove  a Member of the Company;  facilitate direction of  Product Development on behalf of the Company; or  take any other action, which when considered prior to the taking thereof, could reasonably be expected to have a material effect on the Company's business or affairs or which would be considered to outside of the Ordinary Course Business;  provided, however, nothing in this **Section 6.3(c)** shall reduce the requirement for the unanimous consent of the Class A Members required for the acts or actions described in **Section 6.3(b)** hereof.

### 6.4     Action by Class A Members

.     Except as otherwise expressly provided in this Agreement, all determinations, decisions, approvals, actions, designations and consents by the Members shall be determined, made, approved, taken, designated or consented to by the Majority Vote of the Class A Members, and any such determination, decision, approval, action, designation or consent shall constitute the act of the Members. In any circumstances requiring the approval or consent of the Class A Members as specified in this Agreement, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be given or withheld in the sole and absolute discretion of the Class A Members and conveyed at a meeting called in accordance with the provisions of **Article 7** hereof or without a meeting in accordance with the procedure prescribed in **Section 7.10** hereof.

### 6.5     Voting Rights

.  The Class A Members shall have the right to vote on the matters expressly set forth in this Agreement and such other matters as are otherwise presented to the Class A Members for a

vote in accordance with the procedure set forth in **Article 7** hereof.  Except as otherwise provided herein, each Class A Member:   is a voting Member;  shall be entitled to vote with respect to his Membership Interest and  shall be entitled to exercise voting power equal to one (1) vote for each Class A Unit held by such Class A Member.  Notwithstanding the foregoing, no Class B member, nor any Person who is an Interest Holder or who holds only an Assignee Interest shall be entitled to vote; and no assignee or transferee of a Member's Financial Rights shall be entitled to vote unless and until such Person becomes a Substitute Member in accordance with the provisions of **Section 14.7** hereof.

### 6.6    Committees

. The Class A Members may create one or more committees who serve at the pleasure of the Class A Members.  Any such committee, to the extent specified by the Class A Members, may exercise the authority of the Class A Members in supervising the management of the business and affairs of the Company, except that a committee may not:  authorize distributions, except according to a formula or method prescribed by the Class A Members;  fill vacancies on any committee;  amend the Articles;  adopt, amend or repeal this Agreement;  adopt a plan of merger;  or  authorize or approve the issuance, sale or Transfer of Membership Interests or determine the designation and relative rights, preferences and limitations of a class or series of Membership Interests.  All limitations on the power and authority of the Class A Members shall also apply to committees.

### 6.7    Standard of Conduct

. Each Member shall discharge his duties as a Member in good faith, in a manner the Member reasonably believes to be in the best interest of the Company and with the care an ordinary prudent person in a like position would exercise under similar circumstances.  In discharging his duties, a Member is entitled to rely on information, opinions, reports or statements including financial statements and other financial data, if prepared or presented by one or more of the Officers or employees of the Company whom the Member reasonably believes to be reliable and competent in the matters presented;  or legal counsel, public accountants or other Persons as to matters the Member reasonably believes are within such Person's professional or expert competence.  A Member who has knowledge concerning the matter in question that makes reliance otherwise permitted by this **Section 6.7** unwarranted is not acting in good faith.

### 6.8    Limitations on Liability.

(a)    A Member shall not be liable for any action taken as Member, or any failure to take action as a Member, except to the extent that:  such action or failure to take action constitutes a breach of this Agreement;  the conduct of a Member fails to comply with the standards set forth in **Section 6.7** hereof; or  such Member is liable for wrongful distributions under § 18-607 of the Act.

(b)    No Member shall be personally liable for the acts, debts, liabilities, or any obligations of the Company, whether such arise in contract, tort or otherwise.  A Member

shall be liable only to make required Capital Contributions and, except as otherwise expressly provided herein, shall not be required to lend any funds to the Company.

**6.9    Compensation, Expenses and Loans**

(a)    Except as otherwise provided in this Agreement or as otherwise approved by the Class A Members, no Member shall have any right to receive any salary, guaranteed payment, compensation or other remuneration for or acting in the Company's business or for services performed on behalf of the Company.

(b)    All expenses incurred in connection with the formation and organization of the Company shall be borne by and shall be payable by the Company, and to the extent paid by any Class A Member, the Company shall reimburse such Class A Member the full amount thereof.

(c)    All usual and customary expenses of operating the business of the Company shall be borne and shall be payable by the Company, and the Company shall adopt policies and procedures respecting the reimbursement of expenses incurred by the Class A Members on behalf of the Company. Each Class A Member may charge the Company for and obtain reimbursement of expenses reasonably incurred on behalf of the Company provided that such expenses are the type approved for reimbursement by the Company pursuant to the reimbursement policies and procedures in effect at the time that the expense is incurred.

(d)    With the consent of the Class A Members, any Member or Affiliate of a Member may, lend or advance money to the Company. If any Member or Affiliate shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company. The amount of any such loan or advance by a Member or Affiliate of a Member shall be repayable solely out of the Company's assets and shall bear interest at an annual rate equal to the lesser of one percent (1%) in excess of the Base Rate, or the maximum rate permitted by Applicable Law.

(e)    Members involved in the daily operation of the Company shall receive a salary as determined by the standard market value of such duties. Salaries shall be agreed upon in writing and memorialized in a Compensation Agreement which shall be approved by a unanimous vote of the Class A Members.

**6.10    Confidentiality.**

(a)    Each Member covenants and agrees that so long as he is a Member and thereafter, he will not disclose to any other Person any confidential information, except for disclosures to the Members, Officers, key employees, independent accountants and attorneys of the Company as may be necessary or appropriate in the performance of a Person's duties hereunder, and except for such disclosures as are required under

Applicable Law.   For purposes of this Agreement, the term "confidential information" means and includes any and all non-public and proprietary information regarding the assets, liabilities, operations, business, affairs, financing, services, products and trade secrets of the Company or any of its officers, directors, shareholders, partners, members, employees or agents.   The term "confidential information" shall include, without limitation, all financial statements, financial information, projections, forecasts, business plans, methods, ideas, concepts, materials, documents, records, computer programs, customer lists, referral sources, work, models, processes, designs, drawings, plans, inventions, devices, parts, improvements, other physical and intellectual property or other information in any form whatsoever; provided, however, the term "confidential information" shall not include any information which  was in the possession of a Person prior to the date he became a Member or Manager;  becomes generally available to the public, other than as the result of a disclosure made by the Member, the Manager or their respective agents, attorneys, representatives or advisors;  or  becomes available on a non-confidential basis from a source other than the Company.

(b)      Since irreparable harm will result to the Company if any Member violates or attempts to violate the provisions of **Section 6.10(a)** hereof, each Member agrees that the Company shall be entitled to enjoin and restrain the Member from continuing any act that violates the provisions of **Section 6.10(a)** provided, however, nothing contained in this **Section 6.10(b)** shall be construed as a waiver or election by the Company to forego any other remedy or remedies that may be available to it hereunder or at law or in equity.

## ARTICLE 7
## MEETINGS OF THE MEMBERS

**7.1      Meetings**

. Meetings of the Members are not required but may be called by the President or at the request of any Class A Member or group of Class A Members holding Fifty percent (50%) or more of the voting power then held by Class A Members.  If a meeting is called by a Class A Member or Class A Members as aforesaid, such Member or Members shall sign, date and deliver to the President, or such other individual as may be designated by the President, a written demand for the meeting, which such demand shall state the nature of the business to be transacted at such meeting.  Meetings of the Class A Members shall be held at the Company's principal executive office or at any other place designated by the Person calling the meeting; provided, however, unless approved by the Class A Members, meetings shall be held in the county where the Company's principal executive office is located.  Notice of any meeting of the Class A Members shall be given to all the Class A Members as provided in **Section 7.3** hereof.

**7.2      Meetings by Electronic Communication**

. Provided all other requirements for a meeting are satisfied, any meeting of the Class A Members may take place by telephone conference call or any other form of electronic communication through which the participants may simultaneously hear each other, and the participation of a Class A Member by any such electronic communication constitutes attendance

26

at such meeting.  Any such meeting shall be deemed to be held at the Company's principal executive office or at the place properly designated in the Notice of the meeting.

### 7.3     Notice of Meetings

.  Notice of the date, time and place of each meeting, together with a statement of the nature of the business to be transacted at such meeting, shall be given to each Class A Member entitled to vote on the matters to be considered not less than ten (10) Business Days nor more than sixty (60) days prior to the date of such meeting; provided, however, Notice of a meeting to be held by reason of the written demand therefor by one or more Class A Members as provided herein shall be given within seven (7) days following the receipt of a written demand therefor.

### 7.4     Waiver of Notice

.  Any Class A Member may waive any Notice required by the Act, this Agreement or the Certificate.  If the waiver of Notice by the Class A Member entitled thereto is in writing, such waiver is effective, whether given before or after the meeting or other balloting, and such waiver shall be the equivalent of giving Notice.  The President, or such other individual as may be designated by the President, shall place any written waiver of Notice in the records of the Company.  Attendance at a meeting by a Class A Member shall constitute a waiver of Notice of such meeting, unless:   at the beginning of the meeting (or promptly upon his arrival) such Class A Member objects to the transaction of business because the meeting is not lawfully called or convened; or  before a vote on an item of business such Class A Member objects because the item may not lawfully be considered at the meeting.  The President, or such other individual as may be designated by the President, shall note any such objection in the minutes of the meeting.

### 7.5     Record Date

.  A determination of the Class A Members entitled to Notice of or to vote at any meeting or any adjournment thereof, or of the Class A Members entitled to receive payment of any distribution or in order to make a determination of the Class A Members for any other purpose shall be made as follows:

(a)     The record date for determining the Class A Members entitled to Notice of or to vote at any meeting or adjournment thereof shall be 5:00 p.m. (local time at the Company's principal executive office, or if there is no principal executive office, at the Company's registered office) on the Business Day immediately preceding the date the Notice of any meeting is mailed;

(b)     If a meeting of the Class A Members is called pursuant to the demand of a Class A Member or Class A Members, the record date for determining the Class A Members entitled to Notice of or to vote at such special meeting or adjournment thereof shall be 5:00 p.m. (local time at the Company's principal executive office, or if there is no principal executive office, at the Company's registered office) on the Business Day immediately preceding the date of the demand for such special meeting;

(c)     The record date for determining the Class A Members entitled to receive a payment of any distribution shall be 5:00 p.m. (local time at the Company's principal

executive office, or if there is no principal executive office, at the Company's registered office) on the date on which the resolution declaring such distribution is adopted; or

(d)    If such determination is for any other purpose, the President (or other Person designated by the Class A Members) shall fix the record date for such determination of the Class A Members; provided, however, such record date shall not be more than thirty (30) days before the action requiring a determination of the Class A Members.

### 7.6    Quorum

. Class A Members holding one hundred percent (100%) of the voting power then held by Class A Members entitled to vote at a meeting shall constitute a quorum for the transaction of business. Once a Membership Interest is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting, unless a new record date is or must be set for that adjourned meeting.

### 7.7    Voting List

. When the record date for any meeting has been set or a request for consent action has been mailed, the President, or such other individual as may be designated by the President, shall prepare a list of names of all the Class A Members who are entitled to vote. Such list shall contain the address and Membership Interest of each Class A Member and, if different, the voting power held by each Class A Member as reflected in the records of the Company on the record date. Such list shall be available at the Company's principal executive office during normal business hours for inspection and copying by any Class A Member beginning two (2) Business Days after the Notice of a meeting or request for consent action has been mailed through the date of the meeting or the action is taken without a meeting.

### 7.8    Proxies

. A Class A Member may authorize another Class A Member to vote or act for him by proxy on all matters in which a Class A Member is entitled to participate, whether at a meeting or otherwise. Each proxy must be in writing and signed by the Class A Member or his attorney-in-fact and shall be effective when received by the Person entitled to tabulate votes. Unless otherwise expressly provided in the proxy, no proxy shall be valid after the expiration of eleven (11) months from the date thereof. Unless the proxy conspicuously states that it is irrevocable and that the appointment is coupled with an interest, every proxy shall be revocable at the pleasure of the Class A Member executing the same.

### 7.9    Voting and Voting Rights

. Each Member shall have the voting rights and the number of votes set forth in **Section 6.5** hereof.

### 7.10    Action without a Meeting

.

(a)     Except as otherwise expressly provided in this Agreement, any action that may be taken at a meeting of the Class A Members may be taken by written consent without a meeting, if all Class A Members entitled to vote receive Notice of such action, written waiver of action at a meeting is signed by Class A Members holding more than fifty percent (50%) of the voting power then held by Class A Members entitled to vote, and the written consent is signed by Class A Members who are entitled to cast the number of votes equal to the number required to take the same action at a meeting of the Class A Members at which all Class A Members were present.

(b)     For purposes of obtaining the written consent of the Class A Members without a meeting, the President, acting on his own initiative, may propose that the Members take action by written consent without a meeting. All Class A Members entitled to vote shall be given Notice of such proposal, which shall contain a statement concerning the voting effect of the failure to respond. The President may require a written response within a specified time, but not less than fifteen (15) days nor more than sixty (60) days from the effective date of the Notice requesting the written consent without a meeting and, except as otherwise expressly provided in this Agreement, the failure of a Class A Member to respond within any such time period shall constitute a vote which is consistent with the recommendation of the President. If the votes of those Class A Members responding in favor of the proposal, combined with the votes of the Class A Members failing to respond, are equal to the votes required to take the same action at a meeting of the Class A Members, then such proposal shall become the action of the Class A Members at the expiration of the period of time for response without further authorization by any Class A Member.

(c)     Any action taken pursuant to this **Section 7.10** shall have the effect of a vote at a meeting and may be described as such in any document.

## ARTICLE 8
## MEMBERS' REPRESENTATIONS AND WARRANTIES

### 8.1     General Representations and Warranties

. As of the date hereof, each Member hereby makes each of the following representations and warranties that are applicable to such Member, and such warranties and representations shall survive the execution and delivery of this Agreement:

(a)     Such Member has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and this Agreement constitutes the legal, valid and binding obligation of such Member.

(b)     If such Member is a corporation, trust, partnership or limited liability company: it is duly organized or duly formed, validly existing, and in good standing under the Applicable Laws of the jurisdiction of its incorporation, creation or formation and has the power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby; it is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the

29

failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder; and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary action and will not conflict with or violate any provisions of the articles of incorporation, bylaws, trust agreement, partnership agreement, articles of organization or operating agreement of such Member.

(c)     Neither the execution, delivery, and performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any Applicable Law;  will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of its material properties or assets is subject;  will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member is a party or by which such Member is or may be bound; or  will result in the creation or imposition of any lien upon any of the material properties or assets of such Member.

(d)     Any registration, declaration or filing with, or consent, approval, license, permit, or other authorization or order by, any Governmental Authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the effective date of this Agreement.

(e)     There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member, threatened against or affecting such Member or any of its properties, assets, or businesses before or by any Governmental Authority or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the financial condition of such Member; and such Member has not received any currently effective notice of any default, and such Member is not in default under any applicable order, writ, injunction, decree, permit, determination or award of any Governmental Authority or any arbitrator which could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member.

**8.2     Investment Representations**

. As of the date hereof, each Member hereby makes each of the following representations and warranties with respect to his investment in the Company, which such representations and warranties shall survive the execution and delivery of this Agreement:

(a)     Such Member's acquisition of its Membership Interest is being made for its own account for investment, and not with a view to the Transfer, sale or distribution thereof; and each Member further acknowledges that the Company will not, and has no obligation to, recognize any Transfer of all or any part of such Member's Membership Interest to any Person except in accordance with the applicable provisions of this Agreement.

(b)     Such Member is financially able to bear the economic risk of an investment in the Company and has no need for liquidity in this investment. Furthermore, the financial condition of such Member is of such proportion that the total investment in the Company is not material when compared to such Member's total financial capacity.

(c)     Such Member has such knowledge, experience and skill in financial and business matters in general and specifically with respect to investments similar to an investment in the Company and, therefore, is capable of evaluating the merits and risks of an investment in the Company and of making an informed business decision with respect to an investment in the Company.

(d)     Such Member  is acquiring its Membership Interest based upon his own investigation;  the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise;  has received all information that such Member deems necessary to make an informed investment decision with respect to an investment in the Company;  has had the unrestricted opportunity to make such investigation as such Member desires pertaining to the Company and an investment therein and to verify information furnished to such Member; and  has had the opportunity to ask questions of representatives of the Company and such Member's investment therein.

(e)     Such Member understands that such Member must bear the economic risk of an investment in the Company for an indefinite period of time because  the Membership Interests have not been registered under the Securities Act or any applicable state securities laws; and  pursuant to the terms of this Agreement, there are restrictions on the Transfer of the Membership Interests.  Furthermore, such Member understands that the Company is not obligated to register the Membership Interests for resale under the Securities Act or any applicable state securities laws or to provide any Member with information or assistance in complying with any exemption under the Securities Act or any applicable state securities laws.

**ARTICLE 9**
**OFFICERS**

**9.1     Officers**

. The Company shall have a President and may have such other Officers, as the Class A Members may from time to time deem necessary or advisable.  Such other Officers may include,

without limitation one or more vice presidents, a treasurer, a controller and one or more assistant treasurers and assistant secretaries.  Any number of offices may be held by the same Person.

### 9.2    Power and Authority of Officers

.   Subject to the terms of this Agreement and in accordance with the policies and directives of the Class A Members, the day to day management and control of the Company and its business and affairs shall be conducted by, or under the direction of, the Officers.  The Officers shall have the duties specified in this Agreement or in a resolution adopted by the Class A Members; and the Officers shall have the right, power and authority specified in this Agreement, specified in a resolution adopted by the Class A Members or which are necessary, advisable or convenient to the discharge of their duties.

### 9.3    Election and Term

.  At any meeting called for that purpose, the Class A Members shall elect a President, together with such other Officers as the Class A Members shall determine.  Each Officer shall serve at the pleasure of the Class A Members until his successor is elected and qualified or until his earlier resignation or removal.  The initial Officers of the Company are as follows:

| Name: | Title: |
|---|---|
| Steve Marinelli | President and Chief Executive Officer |
| Dr. Chris Waganer | Chief Medical Officer |
| Gwen Duffield | Chief Financial Officer |
| Will Duffield | Chief Operating Officer |
| Ed Karpowicz | Executive Vice President of Business Development |

### 9.4    President

.  The President shall be the chief executive officer of the Company.  As the chief executive officer, but at all times subject to the direction of the Class A Members, the President shall be primarily responsible for the general overall supervision of the business and affairs of the Company and for implementing the policies and directives of the Class A Members.  The President shall, when present, preside over all meetings of the Class A Members.  The President shall have the right, power, authority and responsibility to manage the day to day affairs of the Company in accordance with the policies and directives of the Class A Members and shall in general perform such other duties as may be assigned by the Class A Members from time to time.  The right, power and authority of the President is at all times subject to the limitations and restrictions contained in this Agreement, including, without limitation the limitations set forth in **Sections 6.1** and **6.3** hereof.  Subject to the foregoing, the President shall have the specific power, authority and responsibility to:

    (a)    effectuate this Agreement and the directives of the Class A Members;

    (b)    direct and supervise the day to day operations of the Company;

32

(c)     within such parameters as may be established by the Class A Members, make, execute and deliver on behalf of the Company and in furtherance of the business and affairs of the Company any and all agreements, contracts, documents, certifications, leases, deeds, mortgages, deeds of trust, security agreements, notes, bills of sale or other instruments necessary or convenient in connection with the operation, management and maintenance of the Company;

(d)     within such parameters as may be established by the Class A Members, establish charges for services and products of the Company as may be necessary to provide income for the efficient operation of the Company;

(e)     within such parameters as may be established by the Class A Members, establish charges for services and products of the Company as may be necessary to provide income for the efficient operation of the Company;

(f)     within the budgets established by the Class A Members, set and adjust wages and rates of compensation for all employees of the Company;

(g)     appoint, hire, dismiss and supervise all employees, contracted third parties, and other personnel (other than Officers) and regulate their hours of work;

(h)     prepare or cause to be prepared the reports and tax returns described in **Sections 12.3** and **12.4** of this Agreement;

(i)     Keep the Class A Members advised in all matters pertaining to the operation of the Company and, to this end, will prepare (or cause to be prepared) and submit reports to the Class A Members at any meeting of the Class A Members and at other times as directed by the Class A Members;

(j)     Perform such other duties as the Class A Members may from time to time prescribe or delegate;

(k)     Maintain the Company's records;

(l)     Attend all meetings of the Class A Members and record minutes thereof; give, or cause to be given, such Notice as may be required of all meetings of the Class A Members;

(m)     Certify, attest or authenticate records of the Company and resolutions or consents by the Class A Members; and

(n)     Prepare a list of the names of all Members entitled to vote at any meeting of the Class A Members or for purposes of sending a notice or request for a consent action and show the address of such Member and Membership Interest, Units and voting power, if different, held by each Member or reflected on the records of the Company on the proposed record date.  Such list shall be available for inspection by any Class A Member two (2) Business Days following the date the Notice is given through the date of the meeting or the action is taken without a meeting.

**9.5     Right to Rely on the President**

(a)     Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the President as to:  the identity of any Member or Officer;  the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by a Member or which are in any other manner germane to the affairs of the Company;  the Persons who are authorized to execute and deliver any instrument or document of the Company; or  any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

(b)     Provided the action is approved as required herein, the signature of the President shall be sufficient to convey title to any real property owned by the Company or to execute any promissory notes, trust deeds, mortgages, or other instruments of hypothecation, and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of the President shall be sufficient to execute any "statement of the Company" or other documents necessary to effectuate this or any other provision of this Agreement.

(c)     All of the Members do hereby appoint the President as their attorneyinfact for the execution of any or all of the documents described in this **Section 9.6**.

**9.6     Duties of Other Officers**

. The duties and powers of the Officers, other than the President, shall be as follows:

(a)     The Chief Operating Officer or, if more than one, in the order designated by the Members, shall exercise the functions of the President during the absence or disability of the President and shall perform such other duties as the Members may from time to time designate.

(b)     The chief financial officer of the Company shall have general supervision over the funds of the Company and the investment or deposit thereof.  The treasurer shall advise the Members and the Officers regarding the financial condition of the Company, manage the company's finances, provide strategic finance goals for the company, develop and maintain the company's budgets, ensure the Company's compliance with the requirements of regulatory entities, develop and maintain financial sheets, coordinate with accounts and perform such other duties as the Members may from time to time designate.

(c)     The Chief Medical Officer shall provide the long term medical vision for the Company and oversee the Company's medical device development.

34

(d)      The Chief Operating Officer shall run all business operations as directed by the Chief Executive Officer including, but not limited to, manufacturing, supply, logistics, quality, outsourcing, sales, and personnel matters to ensure Company metrics are met with regard to quality, on time performance, and safety.

(e)      The Executive Vice President of Business Development shall perform such activities as are delegated by the Chief Executive Officer.

### 9.7      Standard of Conduct

. An Officer shall discharge the duties of his office in good faith, in a manner the Officer reasonably believes to be in the best interest of the Company and with the care an ordinary prudent person in a like position would exercise under similar circumstances.  In discharging his duties, an Officer is entitled to rely on information, opinions, reports or statements including financial statements and other financial data, if prepared or presented by one or more of the Officers or employees of the Company whom the Officer reasonably believes to be reliable and competent in the matters presented; or legal counsel, public accountants or other Persons as to matters the Officer reasonably believes are within such Person's professional or expert competence.  An Officer who has knowledge concerning the matter in question that makes reliance otherwise permitted by this **Section 9.8** unwarranted is not acting in good faith.  An Officer shall not be liable for any action taken as an Officer or any failure to take action, if the Officer has performed the duties of his office in compliance with this provision.

### 9.8      Resignation

. Any Officer may resign at any time by giving Notice to the Class A Members of the Company.  The resignation of an Officer who is also a Member shall not affect such Person's rights as a Member and shall not constitute a Withdrawal of such Person as a Member.

### 9.9      Removal

. The Officers serve at the pleasure of the Class A Members; accordingly, any Officer may be removed by the Class A Members, at any time, with or without cause.

### 9.10     Vacancies

. Any vacancy in the office of President by resignation, death or incompetence or otherwise, shall be filled by the Class A Members prior to the effective date of any such vacancy or as soon thereafter as reasonably possible, and in any event within twenty (20) days of the delivery of a Notice of resignation.  Any vacancy in the office of any other Officer by resignation, death, incompetence or otherwise, shall be filled at such time as the Class A Members shall determine.

### 9.11     Compensation

35

.  The salaries or other compensation of the Officers shall be fixed from time to time by the Class A Members, and no Officer shall be prevented from receiving such salary or compensation by reason of the fact that he is also a Member.

## ARTICLE 10
## CONFLICTS OF INTEREST TRANSACTION

### 10.1   Definition and Scope

.  A "Conflict of Interest Transaction" means a transaction to which the Company is a party and in which a Member or Officer has a direct or indirect interest.  A Member or Officer has an indirect interest in a transaction, if, but not only if:  another Person in which the Member or Officer has a material financial interest is a party to the transaction; or   another Person in which the Member or Officer is a member, governor, director, manager, officer, general partner or trustee is a party to the transaction.

### 10.2   Effect

.  A Conflict of Interest Transaction is not void and is not voidable by the Company solely because of a Member or Officer had a direct or indirect interest therein, if any one (1) of the following is true:  (a) the material facts of the Conflict of Interest Transaction  and the interest of the Member or Officer were disclosed or known to all disinterested Class A Members, and the disinterested Class A Members unanimously authorized, approved or ratified the Conflict of Interest Transaction; or (b) the material facts of the Conflict of Interest Transaction and the interest of the Member or Officer were disclosed or known to  all the Class A Members and all the Class A Members unanimously authorized, approved or ratified the transaction, even if one (1) or more, or all, the Members had direct or indirect interest in the Conflict of Interest Transaction.

## ARTICLE 11
## INDEMNIFICATION

### 11.1   Certain Definitions

.  As used in this **Article 11**, the following terms shall have the following meanings:

Any reference to the "**Company**" or a "**limited liability company**" shall include, in addition to the resulting or surviving entity, any constituent entity (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify a Responsible Person, so that any Responsible Person who is or was a director, officer, governor, manager, member, employee, representative or agent of such constituent entity, or is or was serving at the request of such constituent entity as a director, officer, governor, manager, employee, representative or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this **Article 11** with respect to the resulting or surviving entity as he or she would have with respect to such constituent entity if its separate existence had continued.

36

"**Expenses**" means all reasonable costs, fees and expenses, including, without limitation, attorney's fees reasonably incurred in connection with a Proceeding.

"**Liabilities**" means the obligation to pay a judgment, settlement, penalty, fine, including an excise tax assessed with respect to an employee benefit plan, or reasonable Expenses incurred with respect to a Proceeding.

"**Official Capacity**" means: the position of director or governor in a limited liability company managed by a board of directors or governors; the position of manager in a limited liability company managed by one or more managers; a member who took an action of management as a member in a limited liability company managed by its members; or any other elective or appointive office or position held by an officer, member of a committee of the board of directors or member of a committee of the managers or members or the employment or agency relationship undertaken by an employee or agent on behalf of the limited liability company. The term "Official Capacity" does not mean service for any other foreign or domestic entity.

"**Party**" means any Person who was, is or is threatened to be made a named defendant or respondent in a Proceeding.

"**Proceeding**" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company).

"**Special Legal Counsel**" means counsel who has not represented the Company, or any Affiliate of the Company, or any Person whose indemnification is in issue.

"**Responsible Person**" means a Person who is or was a director or governor of a limited liability company managed by a board of directors or governors, a manager of a limited liability company managed by one or more managers or a member of a limited liability company managed by its members, or a Person who, while a director or governor of a limited liability company managed by a board of directors or governors, a manager of a limited liability company managed by one or more managers, or a member of a limited liability company managed by its members, is or was serving at the limited liability company's request as a director, governor, manager, officer, partner, trustee, employee or agent of an employee benefit plan or any other foreign or domestic entity. For purposes of this paragraph, a director of a director-managed limited liability company, a manager of a manager-managed limited liability company or a member of a member-managed limited liability company is considered to be serving an employee benefit plan at the limited liability company's request, if the director's, manager's or member's duties to the limited liability company also impose duties on, or otherwise involve services by, the director, manager or member to the plan or to participants in or beneficiaries of the plan. Unless the context requires otherwise, the term "Responsible Person" includes the estate or Personal Representative of a Responsible Person.

**11.2    Authority to Indemnify**

. Except as provided in **Section 11.6** hereof, the Company has the authority to and may indemnify any Person who was or is a Party or is threatened to be made a Party to any Proceeding because such Person is or was a Responsible Person against all Liabilities actually and reasonably incurred by such Person in connection with such Proceeding, if such Person acted in good faith; when acting in his Official Capacity, such Person was acting in a manner that he reasonably believed that his conduct was in the Company's best interest; where not acting in his Official Capacity, such Person's conduct was not opposed to the best interests of the Company; and with respect to any criminal action or proceeding, such Person had no reasonable cause to believe his conduct was unlawful.

(a)     The conduct of a Responsible Person, with respect to an employee benefit plan, for a purpose such Person reasonably believed to be in the best interests of the participants in and beneficiaries of the plan, is conduct that satisfies the requirement of this **Section 11.2**.

(b)     The termination of any Proceeding by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, is not, of itself, determinative that a Responsible Person did not meet the standards of conduct set forth in this **Section 11.2**.

(c)     Unless ordered by a court of competent jurisdiction, the Company may not indemnify a Responsible Person in connection with a Proceeding in which the Responsible Person was adjudged liable to the Company; or in which such Responsible Person was adjudged liable on the basis that personal benefit was improperly received by such Responsible Person.

**11.3    Mandatory Indemnification**

. If a Person has been wholly successful, on the merits or otherwise, in defense of any Proceeding to which such Person was a Party because such Person is or was a Responsible Person, the Company shall indemnify such Person from and against all Expenses reasonably incurred in connection with such Proceeding.

**11.4    Advances for Expenses**

. The Company may pay or reimburse the Expenses incurred by a Responsible Person who is a Party in advance of the final disposition of Proceeding if the Responsible Person provides to the Company his written affirmation of his good faith belief that he has met the standards of conduct set forth **Section 11.2** hereof; the Responsible Person provides to the Company a written undertaking executed by or on behalf of such Responsible Person to repay the advance, if it is ultimately determined that the Responsible Person is not entitled to indemnification, which such undertaking shall be an unlimited general obligation of the Responsible Person, need not be secured and may be accepted without reference to financial ability to make repayment; and a determination that the facts then known to those making the determination would not preclude indemnification under **Section 11.2** hereof. Determinations and authorizations of payments under this **Section 11.4** shall be made in the manner specified in **Section 11.5** hereof.

**11.5    Determination and Authorization**

.

(a)    Unless ordered by a court of competent jurisdiction, the Company may not indemnify a Responsible Person under **Section 11.3** hereof unless authorized in the specific case after a determination that indemnification of the Responsible Person is permissible in the circumstances because such Responsible Person has met the applicable standard of conduct set forth in **Section 11.2** hereof.  Any determination with respect to the authorization to indemnify any Responsible Person shall be made as follows:

(i)    By the Class A Members (any Member that is a Party to the Proceeding shall not participate in such determination);

(ii)    If a quorum cannot be obtained under **Section 11.5(a)(i)** hereof, by majority vote of a committee duly designated by the Class A Members (any Member that is a Party to the Proceeding may participate in such designation) consisting solely of two (2) or more Class A Members who are not at the time Parties to the Proceeding; or

(iii)    By Special Legal Counsel selected in the manner prescribed in **Section 11.5(a)(i)** or **11.5(a)(ii)** hereof, as applicable.  Upon the request of any Member, such determination shall be made by Special Legal Counsel selected by the Class A Members (in which vote any Member who is a party to such action, suit or proceeding may participate).

(b)    Authorization of indemnification and evaluation as to reasonableness of Expenses shall be made in the same manner as the determination that indemnification is permissible under **Section 11.5(a)** hereof; provided, however, if the determination that indemnification is permissible was made by Special Legal Counsel, authorization of indemnification and evaluation as to reasonableness of Expenses shall be made by those entitled to select the Special Legal Counsel under **Section 11.5(a)(iii)** hereof.

**11.6    Not Exclusive; Prohibition Against Indemnification**

.  The indemnification and advancement of Expenses provided by, and authorized under, this **Article 11** shall not be deemed exclusive of any other rights to which a Responsible Person seeking indemnification or advancement of Expenses may be entitled under any agreement, vote of disinterested Class A Members or otherwise; provided, however, no indemnification may be made to or in behalf of any Responsible Person if a judgment or other final adjudication adverse to such Person establishes such Person's liability:  for any breach of the duty of loyalty to the Company or the Members;  for acts or omissions not in good faith or which involve fraud, intentional misconduct or a knowing violation of Applicable Law; or  under § 48-249-307 of the Act.  Notwithstanding anything in this **Article 11** to the contrary, the Company will not have the obligation to indemnify any Person with respect to Proceedings, claims or actions initiated or brought voluntarily by such Person and not by way of defense.

**11.7    Indemnification of Others**

(a)     Nothing contained in this **Article 11** shall limit or affect the right to indemnification to which a Person other than a Responsible Person may be entitled by contract or otherwise.

(b)     An Officer who is not a Responsible Person is entitled to mandatory indemnification under **Section 11.3** hereof.

(c)     If the Class A Members determine that it is in the best interest of the Company to do so, the Company may indemnify any Person in its employ who is not a Responsible Person to the same extent or a greater extent as a Responsible Person.

**11.8     Insurance**

.  The Company may purchase and maintain insurance on behalf of a Person who is or was a Responsible Person, Officer, employee, independent contractor or agent of the Company, or who, while a Responsible Person, Officer, employee, independent contractor or agent of the Company, is or was serving at the request of the Company as a Responsible Person, Officer, partner, trustee, employee, independent contractor or agent of an employee benefit plan or any other domestic or foreign entity, against liability asserted against or incurred by such Person acting in that capacity, or arising from such Person's status as a Responsible Person, Officer, employee, independent contractor or agent, whether or not the Company would have the power to indemnify the Person against the same liability pursuant to the provisions of this **Article 11**.

**ARTICLE 12**
**FISCAL MATTERS; BOOKS AND RECORDS**

**12.1     Books and Records**

.  The Company shall maintain at its principal executive office, or at such other place or places as designated from time to time by the Class A Members, separate books of account for the Company that shall show a true and accurate record of all assets and liabilities, costs and expenses incurred, all charges and expenditures made, all credits made and received, and all income derived in connection with the operation of the Company's business in accordance with GAAP or the method of accounting utilized by the Company for federal income tax purposes consistently applied.  The expenses and expenditures chargeable to the Company shall include only those which are reasonable and necessary for the ordinary and efficient operation of the Company's business and the performance of the obligations of the Company under any agreements relating to the business of the Company.  Each Member shall, at his sole expense, have the right, at any time upon not less than seven (7) days prior Notice to examine, copy, and audit the Company's books and records during normal business hours.  The company shall furnish a list of the name, address and Membership Interest held by each Member to any Member who requests such list in writing for any proper purpose, and the cost of furnishing such list shall be borne by the requesting Member.

**12.2     Additional Records**

.  In addition, the following records shall be kept and maintained at the Company's principal executive office:  a current list of the full name, taxpayer identification number and last known business, residence or mailing address of each Member, together with the number of Units held by each Member;  a current list of the full name, taxpayer identification number and last known business, residence or mailing address of each Interest Holder and the Assignee Interest held by each such Interest Holder;  the full name and last known business, residence or mailing address of each Officer;   copy of the Articles and all amendments thereto;  a copy of this Agreement and all amendments hereto;  copies of the Company's federal, state and local income tax returns for the three (3) most recent Fiscal Years;  financial information sufficient to provide true, correct and complete information regarding the status of the business and financial condition of the Company for each of the three (3) most recent Fiscal Years;  records of all proceedings (meetings or written consents) of the Members;  to the extent not set forth in the Operating Agreement, a statement of all Capital Contributions accepted by the Company, the identity of the contributor and the agreed value of each Capital Contribution;  a copy of any contribution agreement to which the Company is bound;  a copy of the Company's most recent annual report filed with any Governmental Authority; and  any other information required to be kept by the Act.

### 12.3    Reports

.  The President (or any other Member or Officer designated by the Class A Members) shall be responsible for the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

(a)    The President (or any other Member or Officer designated by the Class A Members) shall cause any annual report required in accordance with Applicable Law to be prepared and filed timely.

(b)    As soon as practicable, but in no event more than ninety (90) days, after the end of each Fiscal Year and at such time as distributions are made pursuant to **Section 15.3** hereof, the President (or any other Member or Officer designated by the Class A Members) shall cause to be prepared and furnished to each Member an annual report and financial statements for the Company.  Such financial statements (other than with respect to Capital Accounts, which shall be prepared in accordance with this Agreement) shall be prepared in accordance with GAAP or the method of accounting utilized by the Company for federal income tax purposes consistently applied and shall include the following:   the balance sheet of the Company as of the last day of such Fiscal Year, or applicable period;  a statement of income or loss for the Company for such Fiscal Year or applicable period;  a statement of the Members' Capital Accounts and changes therein for such Fiscal Year or applicable period; and  a statement of the Company's cash flow for such Fiscal Year or applicable period.

### 12.4    Tax Returns

.  The President (or any other Member or Officer designated by the Class A Members) shall cause the Company's accountants to prepare all income and other tax returns for the Company and shall cause the same to be timely filed.  The President (or such other Member or

Officer designated by the Class A Members) shall furnish to each Member a copy of each such tax return, together with any schedules or other information which each Member may require in connection with such Member's own tax affairs (any such information shall be furnished as soon as practicable following the end of the Fiscal Year).

### 12.5    Special Basis Adjustment

. In connection with any Permitted Transfer, the Class A Members may, or at the written request of the transferee shall, on behalf of the Company and at the time and in the manner provided in § 1.754-1(b) of the Regulations, make an election to adjust the basis of the Company Property in the manner provided in §§ 734(b) and 743(b) of the Code. Such transferee shall pay all costs incurred by the Company in connection therewith, including, without limitation, the reasonable fees and disbursements of the Company's attorneys and accountants.

### 12.6    Tax Matters Member

. The Chief Financial Officer is hereby designated as and shall serve as the "**Tax Matters Member**" (as used herein, such term shall have the same meaning as the term "tax matters partner" under § 6231(a)(7) of the Code) until its earlier dissolution, resignation or removal. The Tax Matters Member shall have all powers and responsibilities provided in §§ 6222 through 6231 of the Code; provided, however, the Tax Matters Member shall not compromise any dispute with the Internal Revenue Service without the approval of the Class A Members. The Tax Matters Member shall keep all Members informed of all significant matters and notices that may come to his attention in his capacity as Tax Matters Member from any Taxing Authority that may come to the attention of the Tax Matters Member by giving Notice thereof within ten (10) days after becoming aware thereof and, within such time, shall forward to each Member copies of all significant written communications he may receive in such capacity. The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Member in performing his duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or taxrelated administrative or judicial proceeding against any Member, even though it relates to the Company. Unless the Class A Members otherwise determine, the Tax Matters Member shall be the party designated to receive all notices from the Internal Revenue Service which pertain to the tax affairs of the Company.

(a)    The Tax Matters Member may resign at any time by giving Notice to the Class A Members of the Company; provided, however, any resignation shall not become effective until the first to occur of:  the Class A Members have named a successor to the Tax Matters Member in accordance with the terms of this Agreement, or thirty (30) days following delivery of the Notice of resignation.

(b)    The Tax Matters Member serves at the pleasure of the Class A Members, and may be removed by the Class A Members, at any time, with or without cause.

### 12.7    Bank Accounts

. All funds of the Company shall be deposited by the Company at one or more financial institutions selected by the Class A Members. Withdrawals shall be made only on such signature

or signatures as the Class A Members shall from time to time determine; and funds shall be withdrawn only to be invested in furtherance of the Company's business, to pay the debts or obligations of the Company or to be distributed to the Members in accordance with this Agreement.  The funds of the Company shall not be commingled with the funds of any other Person.

### 12.8   Accounting Decisions

.   Except as otherwise expressly provided in this Agreement, all decisions as to accounting matters shall be made by the President (or any other Member or Officer designated by the Class A Members).

### 12.9   Taxes of Taxing Authority

. To the extent required by the Applicable Laws of any Taxing Authority, each Member covenants and agrees that he will submit an appropriate instrument indicating that such Member will make timely payments of tax to the Taxing Authority and that such Member accepts the personal jurisdiction of the applicable Taxing Authority with respect to the collection of taxes assessed on such Member's share of the Company's income and gain, together with any interest or penalty thereon.  If any Member fails to provide such instrument, the Company may withhold and pay over to the Taxing Authority the amount of any tax, interest or penalty determined under the Applicable Laws of the Taxing Authority with respect to the Member's share of the Company's income and gain.  Any payment of taxes, interest or penalties made by the Company on behalf of any Member shall be treated as a distribution of Cash Available For Distribution.  Where permitted by the applicable rules and regulations of the applicable Taxing Authority, the Company may file a composite, combined or aggregate tax return reflecting the income of the Company and pay the taxes, interest and penalties of some or all of the Members, in which event, the Company shall provide Notice to each Member of the amount of taxes, interest or penalties paid by the Company.

### ARTICLE 13
### NONCOMPETION

### 13.1   Independent   Activities,   Noncompetition,   Non-Disclosure   and   Non-Inducement

.   Except as otherwise provided in this **Section 13.1**, each Member may engage in whatever activities they choose, whether the same are competitive with the Company or otherwise, without having or incurring any liability to the Company or the other Members, and without any obligation to offer any interest in such activities to the Company or any Member.  Notwithstanding the foregoing, the Members hereby acknowledge and agree that each Member owes to the Company and each Member the highest fiduciary loyalty and duty.  In furtherance, and not in limitation, of such loyalty and duty, except as the Class A Members may unanimously agree in writing:

> (a)   Each Member covenants and agrees to disclose and make available to the Company each and every business opportunity that is within the scope and purpose of the Company that such Member becomes aware of in his capacity as a Member or otherwise;

43

provided, however, no such disclosure or offer shall be required with respect to business opportunities that are not within the scope and purpose of the Company. Each Member further agrees that such Member shall be accountable to, and hold in trust for, the Company any income, compensation, or profit that such Member may hereafter derive from any activity that competes with the business of the Company, and that such Member will indemnify the Company for any profits that the Company may reasonably be viewed as having foregone or any loss that it may incur as a result of any failure by such Member to disclose business opportunities to the Company.

(b)     Each Member covenants and agrees that, except for business activities in which such Member is engaged on the date of this Agreement, so long as a Member remains a Member and for a period of twenty four (24) months after the termination of a Member's status as a Member, he shall not, directly or indirectly, as a principal, shareholder, partner, representative, agent, director, officer, employee or in any other manner or capacity whatsoever engage in any business activity that competes with the business of the Company without the unanimous approval of the Class A Members. For the avoidance of doubt, for a period of twenty four (24) months after the termination of a Member's status as a Member, he shall not, directly or indirectly, as a principal, shareholder, partner, representative, agent, director, officer, employee or in any other manner or capacity whatsoever engage in any business activity that is a spine manufacturing company, a spine engineering/design company, or a spine consulting, distribution or sales company.

(i)     The provisions of this **Section 13.1(b)** shall not apply to a former Member if such Member's termination of membership is related to the Company's insolvency, the Member's death or disability, or the Member's other involuntary termination from membership for reasons other than a breach of this **Section 13.1**;

(ii)     A Member shall not be treated as engaging in an activity that competes with the business of the Company solely by reason of (A) owning an equity interest of less than five percent (5%) of the capital and profits of a corporation, partnership, limited liability company or other entity, or (B) owning a debt obligation of any such entity, provided that such debt obligation entitles such Member to receive only interest that is fixed, or varies by reference to an index or formula that is not based on the value or results of operations of such entity; and

(iii)     If for any reason a court of competent jurisdiction shall determine that the foregoing covenant is unenforceable by reason of the scope of the term or the territory involved, the parties agree that the term or territory shall be reduced to the maximum amount or amounts enforceable under Applicable Law.

(c)     Each Member covenants and agrees that so long as he is a Member and thereafter, he will not disclose to any other Person any confidential information, except for disclosures to Governors, Members, Officers, key employees, independent accountants and attorneys of the Company as may be necessary or appropriate in the performance of a Member's duties hereunder. For purposes of this Agreement, the term

"confidential information" means and includes any and all non-public and proprietary information regarding the assets, liabilities, operations, business, affairs, financing, services, products and trade secrets of the Company, any of its Affiliates or any of their respective officers, directors, shareholders, partners, members, employees or agents. The term "confidential information" shall include, without limitation, all financial statements, financial information, projections, forecasts, business plans, methods, ideas, concepts, materials, documents, records, computer programs, customer lists, referral sources, work, models, processes, designs, drawings, plans, inventions, devices, parts, improvements, other physical and intellectual property or other information in any form whatsoever; provided, however, the term "confidential information" shall not include any information which (i) was in the possession of a Member prior to the date he became a Member; (ii) becomes generally available to the public, other than as the result of a disclosure made by the Member or his agents, attorneys, representatives or advisors; or (iii) becomes available on a non-confidential basis from a source other than the Company.

(d)     Upon the termination of a Member's Membership Interest, each Member covenants and agrees (i) not to take with him any document or paper relating to any confidential information or trade secret of the Company, all of which shall be returned to the Company not later than the date on which such a Member's Membership Interest is terminated; (ii) not to contact, solicit business from, interfere with, attempt to disrupt, attempt to profit from, directly or indirectly, any account, customer, client, supplier or other person or entity with whom the Company has a material business relationship; and (iii) not to, directly or indirectly, induce or attempt to induce any of the employees of the Company or any of its subsidiaries or Affiliates to leave the employment of the Company or any of its subsidiaries or Affiliates.

(e)     Since irreparable harm will result to the Company if any Member violates or attempts to violate the provisions of this **Section 13.1**, each Member agrees that the Company shall be entitled to enjoin and restrain the Member from continuing any act that violates the provisions of this **Section 13.1**; provided, however, nothing contained in this **Section 13.1(e)** shall be construed as a waiver or election by the Company to forego any other remedy or remedies that may be available to it hereunder or at law or in equity.

## ARTICLE 14
## TRANSFER OF MEMBERSHIP INTERESTS

### 14.1     Restriction on Transfers

.  Except as otherwise expressly permitted or required by this Agreement, no Member may Transfer or offer to Transfer all or any portion of, or any interest or rights in, the Membership Interest owned by such Member, and no Interest Holder may Transfer all, or any portion of, or any interest or rights in, any Assignee Interest held by such Interest Holder without first obtaining the consent of all of the Class A Members (the Member proposing to Transfer his Membership Interest shall not be entitled to vote with respect to such Transfer). Each Member acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationship of the Members. Any attempted Transfer in

violation of this **Section 14.1** shall be null and void, and the Company shall not be required to recognize the same.

### 14.2    Certain Permitted Transfers

.  Subject to the conditions and restrictions set forth in **Section 14.3** hereof, a Member may at any time Transfer and the provisions of **Section 14.1** hereof shall not apply to any such Transfer:

(a)    All or any portion of his Membership Interest including, without limitation, the Financial Rights and Governance Rights to  the Company;  any other Member; or (iii) any purchaser under the provisions of **Section 14.4**.

(b)    Subject to the right of first refusal provisions of **Section 14.4,** an Assignee Interest to the transferor's Personal Representative to whom such Assignee Interest is Transferred at death, incapacity, or involuntarily by operation of law.   Any such transferee shall become an Interest Holder.  The Transfer of an Assignee Interest shall not allow the transferee to exercise or otherwise control the transferor's Governance Rights, and any attempt to do so shall be null and void and of no force or effect.

### 14.3    Conditions to Permitted Transfers

.  A Transfer shall not be treated as a Permitted Transfer under this Agreement unless and until the following conditions are satisfied:

(a)    Except in the case of a Transfer of a Membership Interest at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as the Company and its counsel may deem necessary or appropriate to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement including this **Article 14**.  In the case of a Transfer of a Membership Interest not described in the preceding sentence, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company.

(b)    The transferor and transferee shall furnish to the Company the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interest Transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information, statements or returns.  The Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any Transferred Membership Interest until it has received such information.

(c)    Except in the case of a Transfer at death or involuntarily by operation of law, either  such Membership Interest shall be registered under the Securities Act, as amended, and any applicable state securities laws, or  the transferor shall provide evidence satisfactory to the Company and its counsel that such Transfer is exempt from

46

all applicable registration requirements and will not violate any Applicable Laws regulating the Transfer of securities.

(d)     The transferor and/or the transferee reimburse the Company for all costs and expenses that it reasonably incurs in connection with such Transfer.

**14.4     Right of First Refusal**

. In addition to the other limitations and restrictions set forth in this **Article 14**, except as expressly permitted by **Section 14.2** hereof, no Person (whether such Person is a Member or an Interest Holder who holds only an Assignee Interest) shall sell or similarly dispose of all or any portion of his Membership Interest or Assignee Interest unless such Member first offers to sell such Membership Interest strictly in accordance with the terms and conditions set forth in this **Section 14.4**.

(a)     As used in this **Section 14.4**, the following terms shall have the following meanings:

(i)     "Accepting Offerees" means those Offeree Members that elect to purchase the Offered Membership Interest pursuant to the provisions of this **Section 14.4**.

(ii)     "First Option Period" means the period ending at 5:00 p.m

(iii)     . (local time at the Company's principal executive office) on the first Business Day following the expiration of one hundred twenty (120) days from the date of the Option Notice."First Purchase Option" has the meaning set forth in **Section 14.4(c)** hereof.

(iv)     "Free Transfer Period" means the period ending at 5:00 p.m

(v)     . (local time at the Company's principal executive office) following the expiration of ninety (90) days from the expiration of the Option Period."Offered Interest" means that portion of the Membership Interest that the Selling Member desires to sell and with respect to which a Purchase Offer has been received. The Offered Interest may be all or any portion of the Membership Interest then held by the Selling Member.

(vi)     "Offeree Members" means all Members other than the Selling Member.

(vii)     "Option Notice" means the Notice from the Selling Member to the Company and the Offeree Members, which shall include: (A) a true and complete copy of the Purchase Offer; (B) evidence that the Proposed Purchaser is not an Affiliate of or otherwise related to the Selling Member; and (C) evidence of the

financial capacity of the Proposed Purchaser to immediately consummate the Purchase Offer.

(viii)   "Option Period" means the period ending at 5:00 p.m

(ix)   . (local time at the Company's principal executive office) on the first business day following the expiration of one hundred fifty (150) days from the date of the Option Notice."Option Price" means the purchase price to be paid for the Offered Interest denominated and payable in United States dollars at closing or according to the terms specified in the Purchase Offer; provided, however, neither the Company nor any Accepting Member shall have any obligation (whether or not required of the Proposed Purchaser under the terms of the Purchase Offer) to: (i) make any earnest money or similar deposit prior to closing; (ii) provide any security (other than the Offered Interest) for any deferred portion of the Option Price; or (iii) pay, provide or deliver any consideration other than cash or a promissory note.

(x)   "Proposed Purchaser" means the Person making the Purchase Offer.

(xi)   "Purchase Offer" means a bona fide offer to purchase the Offered Interest that satisfies the requirements set forth in **Section 14.4(b)** hereof.

(xii)   "Purchase Options" means, collectively, the First Purchase Option, the First Purchase Option and the Second Purchase Option.

(xiii)   "Second Purchase Option" has the meaning set forth in **Section 14.4(c)** hereof.

(xiv)   "Selling Member" means the Member desiring to sell or similarly dispose of all or any portion of his Membership Interest.

(b)   No Transfer may be made pursuant to this **Section 14.4** unless the Selling Member has received a Purchase Offer; and any such Purchase Offer must be (i) in writing, (ii) signed by the Proposed Purchaser, and (iii) irrevocable for a period ending not earlier than the first Business Day following the expiration of the Option Period.

(c)   Prior to making any Transfer that is subject to the terms of this **Section 14.4**, the Selling Member shall deliver the Option Notice to the Company and each Offeree Member, and each of the Offeree Members shall have the option (the "First Purchase Option") to purchase that portion of the Offered Interest that corresponds to the ratio of the number of Units held by such Offer Member to the total number of Units then held by all Offeree Members. Any Offeree Member that desires to exercise the First Purchase Option shall deliver Notice of exercise (such Notice shall be irrevocable) to the Company, the Selling Member and each other Offeree Member prior to the expiration of the First Option Period. If Offeree Members do not exercise the First Purchase Option as to all of the Offered Interest, each of the Accepting Offerees shall have the option (the "Second Purchase Option") to purchase that portion of the Offered Interest that

48

corresponds to the ratio of the number of Units held by such Accepting Offeree to the total number of Units then held by all Accepting Offerees.  Any Accepting Offeree that desires to exercise the Second Purchase Option shall deliver Notice of exercise (such Notice shall be irrevocable) to the Company, the Selling Member and each of the Offeree Members prior to the expiration of the Option Period.  If either of the First Purchase Option or the Second Purchase Option is exercised, the aggregate purchase price to be paid by the Accepting Offerees shall be the Option Price, and each Accepting Offeree shall pay that portion of the Option Price that corresponds to the ratio of the number of Units held by such Accepting Offeree to the total number of Units then held by all Accepting Offerees.

(d)     In the event that either of the Purchase Options is exercised, the closing of the sale of the Offered Interest shall take place within thirty (30) days after the expiration of the Option Period.  The Selling Member and the Accepting Offerees, shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Interest pursuant to the terms of the Purchase Offer and this **Article 14**.  Accepting Offerees shall have the option to purchase the shares at fair market value over a period of not more than five (5) years to be paid in equal installments quarterly over such perod.

(e)     If the neither of the Purchase Options exercised as to all of the Offered Interest, The Class A Members may choose whether to permit the transfer to take place.  If the Class A Members permit the transfer, then the Selling Member may sell the Offered Interest to the Proposed Purchaser at any time within the Free Transfer Period without obtaining the consent of any other Member; provided, however, such sale (i) shall be made on terms no more favorable to the Proposed Purchaser than the terms contained in the Purchase Offer ;and (ii) shall comply with all other terms, conditions, and restrictions of this Agreement that are applicable to sales of Membership Interests and are not expressly made inapplicable to sales occurring under this **Section 14.4**.  Any sale or similar disposition of the Offered Interest made after the expiration of the Free Transfer Period shall again become subject to all of the conditions and restrictions of this **Section 14.4**.

**14.5     Effect of Prohibited Transfers**

.

(a)     Any purported Transfer of a Membership Interest or an Assignee Interest that is not a Permitted Transfer shall be null and void and of no effect whatsoever; provided, however, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Membership Interest or Assignee Interest Transferred shall be strictly limited to an Assignee Interest.  Further, the allocations and distributions provided by this Agreement with respect to such Assignee Interest may be applied (without limiting any other legal or equitable rights of the Company) to satisfy

49

any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interest or Assignee Interest may have to the Company.

(b)     In the case of a Transfer or attempted Transfer of a Membership Interest or Assignee Interest that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorneys fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

(c)     In the event of a purported Transfer of a Membership Interest that is not a Permitted Transfer; the Governance Rights incident to such Membership Interest shall be suspended and shall not be counted for any purposes.

**14.6    Rights of Unadmitted Transferees**

.  The transferee of all or any portion of a Membership Interest who is not admitted as a Substitute Member pursuant to **Section 14.7** hereof shall be entitled to the allocations and distributions attributable to the Financial Rights held by him and shall be required to make any Capital Contributions to be made in respect of the Financial Rights held by him; however, such transferee:  shall have no right to participate in the management of the business and affairs of the Company;  shall have no right to become a Member;  shall be entitled only to the Financial Rights with respect to the such Membership Interest;  shall have no right to any information or accounting of the affairs of the Company;  shall not be entitled to inspect the books or records of the Company; and   shall not have any of the Governance Rights (voting or otherwise) of a Member under the Act and this Agreement.  The Governance Rights formerly incident to the Membership Interest held by a transferee who has not been admitted as a Substitute Member shall lapse unless and until such transferee is admitted as a Substitute Member pursuant to **Section 14.7** hereof.  Notwithstanding the foregoing, if the transferee of a Membership Interest is a Member and the Transfer was a Permitted Transfer, such transferee shall receive and shall be entitled to exercise all of the Governance Rights incident to the Transferred Membership Interest, and none of the restrictions and limitations set forth in this **Section 14.6** shall apply to such transferee..

**14.7    Admission of Transferees as Members**

.  Subject to the other provisions of this **Article 14**, a transferee of a Membership Interest may be admitted to the Company as a Substitute Member only upon satisfaction of the following conditions:   the Class A Members unanimously consent to such admission;  the Membership Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;  the transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Company may reasonably request and as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions hereof;  the transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the

Transferred Membership Interest; and  if the transferee is not an individual of legal majority, the transferee provides to the Company evidence satisfactory to the Company and its counsel of the authority of the transferee to become a Member and to be bound by the terms and conditions of this Agreement.

**14.8    Legend**

. Each Member agrees that a legend in substantially the following form may be placed upon any counterpart of this Agreement or any other document or instrument evidencing ownership of Membership Interests:

> THE MEMBERSHIP INTERESTS DESCRIBED IN THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS, AND THE TRANSFERABILITY OF THE MEMBERSHIP INTERESTS THEREFORE IS RESTRICTED.  THE MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE HEREOF BE RECOGNIZED AS HAVING AN INTEREST IN SUCH MEMBERSHIP INTERESTS BY THE COMPANY FOR ANY PURPOSE, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AS AMENDED, WITH RESPECT TO SUCH MEMBERSHIP INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS OR (2) THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF THE COMPANY AND ITS COUNSEL.

> THE MEMBERSHIP INTERESTS DESCRIBED IN THIS OPERATING AGREEMENT ARE SUBJECT TO FURTHER RESTRICTION AS TO THEIR SALE, TRANSFERABILITY, OR ASSIGNMENT AS MORE FULLY DESCRIBED HEREIN AND AGREED TO BY EACH CLASS A MEMBER.  SAID RESTRICTION PROVIDES, AMONG OTHER THINGS, THAT NO VENDEE, TRANSFEREE, OR ASSIGNEE SHALL BECOME A SUBSTITUTE MEMBER WITHOUT THE CONSENT OF THE CLASS A MEMBERS.

**14.9    Distributions and Allocations**

. If any Membership Interest is Transferred during any Allocation Year in compliance with the provisions of this **Article 14**, Profits, Losses, each item thereof, and all other items attributable to such Membership Interest for such Allocation Year shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with § 706(d) of the Code, using any conventions permitted by Applicable Law and selected by the Class A Members.  All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall

recognize such Transfer not later than the end of the calendar month during which it is given Notice of such Transfer; provided, however, if the Company does not receive a Notice stating the date such Membership Interest was Transferred and such other information as the Company may reasonably require within thirty (30) days after the end of the Allocation Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the Allocation Year during which the Transfer occurs, was the owner of the Membership Interest. The Company shall not incur any liability for making allocations and distributions in accordance with the provisions of this **Section 14.9**, whether or not the Company has knowledge of any Transfer of ownership of any Membership Interest.

**14.10   Withdrawal Rights**

Unless the Class A Members have consented to and approved all of the terms and conditions thereof, no Member shall have right or power to, and each Member covenants that he will not, Withdraw from the Company. Any attempt to Withdraw without such consent shall be null, void and of no force or effect.   If any Member Withdraws or attempts to Withdraw from the Company in violation of this Section 14.10 (any such Withdrawal is referred to as an "Adverse Withdrawal"):

(a)   Such Member shall have breached this Agreement;

(b)   Such Member shall be liable to the Company and the remaining Members for any and all damages caused by such Adverse Withdrawal, including, without limitation, attorneys' fees and disbursements incurred in connection therewith (whether at trial, on appeal or otherwise);

(c)   If the Company is required to, or otherwise elects to recognize, any Adverse Withdrawal, effective as of the date of such Adverse Withdrawal, and without further action on the part of the Company or such Member:   (i) the Membership Interest of such Member shall become an Assignee Interest, (ii) such Member shall become a Holder, and (iii) such Member shall not be entitled to receive the fair value of its Membership Interest as otherwise provided in §48-249-506 of the Act.

**14.11   Expulsion**

(a)   Any Member may be expelled immediately for cause (an "Expulsion For Cause") upon the determination that any of the following reasons for expulsion exist:   such Member is indicted for, pleads guilty or *nolo contendere* to or is convicted of a felony or other crime involving moral turpitude;   the theft, embezzlement, misappropriation, confiscation of or intentional infliction of damage to the Company Property or the Company's business opportunities by such Member; such Member breaches a material provision of this Agreement and fails to cure such breach within thirty (30) days following Notice thereof, which such Notice shall specify with particularity the nature of any such breach;   or   any other willful or intentional misconduct by such Member that is, or may be reasonably expected to be,

injurious to the Company, its business, reputation or prospects. Any determination under this Section 14.11(a) shall be determined by an Arbitrator and then by the Class A Members at a duly constituted meeting specifically noticed for such purpose, and such determination shall be made by the unanimous vote of the Class A Members (the Member that is the subject of the expulsion shall not vote) with respect to any Member.

(b)     At a duly constituted meeting of the Class A Members specifically noticed for such purpose and without a determination of cause (an "Expulsion Without Cause"), any Member may be expelled by the unanimous vote of the Class A Members (the Member that is the subject of the expulsion shall not vote). An Expulsion Without Cause may be employed notwithstanding the fact that grounds may exist for an Expulsion For Cause.

(c)     Upon the expulsion of a Member, all Financial Rights and Governance Rights of such Member shall be terminated, such Member shall have no further right to participate in the Company's business, Profits, Losses, or distributions, and such Member's Units shall revert to the remaining Class A Members pro rata in proportion to the number of Units owned by such Class A Members.

### 14.12   Appraisal and Dissenters' Rights

Except to the extent expressly provided in this Agreement, no Member shall have any appraisal rights or dissenters' rights with respect to his Units, Membership Interest or any other interest in the Company in connection with: (a) any merger, consolidation, other business combination or recapitalization to which the Company is a party; (b) any sale, exchange or other disposition of any assets or properties of the Company; (c) any amendment to any provision of this Agreement; or (d) any other matter, thing or event affecting the Company.

### 14.13   Special Rules Concerning Withdrawal in Initial Two Years

. Notwithstanding anything contained herein to the contrary, in the event of voluntary Withdrawal or dissociation (as defined in the Act) by any Member within twenty-four (24) months from the Effective Date ("**Early Withdrawal**"), the Units held by such Member shall be immediately forfeited and allocated among the other Class A Members on a pro-rata basis in accordance with their Membership Interests (the "**Early Withdrawal Period**"). In the event of Early Withdrawal, such Member's Capital Account shall also be forfeited and allocated in accordance with the foregoing. Upon the expiration of the Early Withdrawal Period with respect to any Member, this **Section 14.13** shall no longer apply. This **Section 14.13** expressly does not apply to in the event of Withdrawal due to the death or Permanent Disability of any Member.

### ARTICLE 15
### DISSOLUTION AND WINDING UP

**15.1    Dissolution.**

The Company shall dissolve and commence winding up its affairs upon the first to occur of any of the following events ("**Dissolution Events**"):  the determination of the Class A Members to dissolve, wind up and liquidate the Company;  the sale of all or substantially all of the assets of the Company and the collection of the purchase price to be paid therefor;  at any time the Company has no Class A Members;  the entry of a decree of judicial dissolution under § 8871 of the Act; or  the occurrence of any other event that causes the dissolution of a limited liability company under the Act.

**15.2    Continuation**

. The Members hereby agree that the Company shall not dissolve prior to the occurrence of a Dissolution Event.  Further, upon the occurrence of the Dissolution Events, set forth in Clause (c) of **Section 15.1** hereof, the Company shall not be dissolved and is not required to be wound up if, within ninety (90) days after the occurrence of the event that terminated the continued membership of the last remaining Class A Member, the Personal Representative of the last remaining Class A Member agrees in writing to continue the Company and to the admission of such Member's Personal Representative or its nominee or designee to the Company as a Member, which such admission shall be effective as of the date of the occurrence of the event that terminated the continued membership of the last remaining Class A Member.

**15.3    Winding Up, Liquidation and Distribution of Assets**

. Unless the Company is continued pursuant to **Section 15.2** hereof, upon the occurrence of a Dissolution Event, the Company shall cease carrying on its business, except as may be necessary for the winding up of its affairs in an orderly manner; however, the Company's existence is not terminated and shall continue until the winding up of its affairs is completed and a certificate of cancellation has been accepted for filing.  The President or such other Person or Persons designated by the Class A Members shall be responsible for overseeing the winding up and liquidation of the Company and shall take full account of the Company's assets and liabilities.  Except to the extent distributed in kind, the Company's assets shall be sold or otherwise liquidated as promptly as is consistent with obtaining the fair value thereof. Equipment and inventory of the Company shall be sold at fair market value to be determined by a sales engineer from the company which sells the applicable equipment or inventory.  All other assets will be sold to obtain remaining cash.  The proceeds from such sales, to the extent sufficient therefor, shall be applied and distributed in the following order:

(a)    First, to pay and discharge all of the Company's debts and liabilities to creditors (including, to the extent permitted by Applicable Law, Members who are creditors) and to establish any reserves that may be reasonably necessary to provide for contingencies or unknown liabilities of the Company (for purposes of determining the Capital Account balance of the Members, the amount of any such reserves shall be treated as an expense of the Company); and

(b)     The balance, if any, to the Members in accordance with the balance of their Capital Accounts after giving effect to all contributions, distributions and allocations for all periods.

The President or other Person or Persons selected by the Class A Members to oversee the winding up and dissolution shall receive such compensation as is approved by the Class A Members for the services performed pursuant to this **Article 15**.

### 15.4    Compliance with Requirements of Regulations

. In the event the Company is "liquidated" within the meaning of § 1.704-1(b)(2)(ii)(g) of the Regulations, distributions shall be made pursuant to this **Article 15** to the Members who have positive Capital Accounts in compliance with § 1.7041(b)(2)(ii)(b)(2) of the Regulations. If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions, and allocations for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to any such deficit, and any such deficit shall not be considered a debt owed to the Company or any other Person for any purpose whatsoever.

### 15.5    Deemed Contribution and Distribution

. Notwithstanding any other provision of this **Article 15** to the contrary, in the event that the Company is terminated within the meaning of § 1.704-1(b)(2)(ii)(g) of the Regulations, but no Dissolution Event has occurred, the Company's assets shall not be liquidated, the Company's liabilities shall not be paid or discharged and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have contributed all of its assets and liabilities to a new limited liability company in exchange for a membership interest therein. Immediately thereafter, the Company shall be deemed to have distributed the membership interest in the new limited liability company to the Members in proportion to their respective Membership Interests in the Company in liquidation of the Company.

### 15.6    Certificate of Cancellation

. Upon completion of the winding up of the affairs of the Company, such Person as the Act may permit or require shall file a certificate of cancellation termination with the Secretary of State of the State of Pennsylvania and take such other actions as may be necessary to terminate the existence of the Company.

### ARTICLE 16
### AMENDMENTS

### 16.1    Amendments

. Amendments to this Agreement may be proposed by the President or any one or more Class A Members . Following such proposal, the President, or such other individual as may be designated by the President, shall submit to the Class A Members a verbatim statement of any proposed amendment; provided, however, counsel for the Company shall first approve the form

of any such amendment. The submission to the Class A Members shall include the recommendation of the President, and the President shall seek the written vote of the Class A Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that he may deem appropriate. For purposes of obtaining a written vote, the President may require response within a reasonable specified time, but not less than fourteen (14) days nor more than sixty (60) days, and failure to respond in such time period shall constitute a vote that is consistent with the President's recommendation with respect to the proposal. A proposed amendment shall be adopted and shall be effective as an amendment hereto if it receives the unanimous affirmative vote or the written consent of the Class A Members.

### 16.2    Limitation on Amendments

. Notwithstanding **Section 16.1** hereof, no amendment to this Agreement shall:

(a)    Except for an amendment required in connection with the admission of an additional Member or the issuance of an Additional Membership Interest in accordance with the terms of this Agreement, modify or alter the method of determining, the order of priority or the interest of a Member in allocations of Profits and Losses, allocations or distributions of Cash Available For Distribution, or allocations or distributions of proceeds resulting from the liquidation of the Company, unless such amendment receives the affirmative vote or written consent of each Class A Member adversely affected thereby.

(b)    Amend the provisions of **Article 14** hereof without the affirmative vote or written consent of all the Class A Members.

(c)    Amend this **Section 16.2** without the affirmative vote or written consent of all the Class A Members.

For purposes of this **Section 16.2** only, the failure of a Member to respond shall not constitute a vote that is consistent with any recommendation of the President with respect to any amendment described in this **Section 16.2**, and any amendment described in this **Section 16.2** shall require the affirmative vote at a meeting of the Class A Members or the affirmative written consent without a meeting in order to be effective.

### 16.3    Execution of Amendments

. Each amendment to this Agreement shall be in writing and shall be executed by all the Class A Members, including, without limitation, each Withdrawing Member and each Substitute Member. Each Member covenants and agrees that he will execute any amendment to this LLC Agreement that has been duly adopted in accordance with the provisions of this **Article 16**; provided, however, in the event any Member fails to execute (or is unable to execute) any such duly adopted amendment, any Officer or Class A Member may execute such amendment as attorney-in-fact for such Member.

**ARTICLE 17**
**POWER OF ATTORNEY**

### 17.1    Appointment

.    Each Member makes, constitutes and appoints the President, with power of substitution, as his true and lawful attorney-in-fact for him with full power and authority in his name, place, and stead and for his use and benefit, from time to time:   to make, sign, execute and deliver any agreements, instruments, certificates and documents provided for herein to effect, evidence or perfect any Transfers effected or required hereunder or pursuant to the terms of this Agreement;  to make, sign, execute, certify and deliver any amendment to this Agreement duly adopted by the Class A Members in accordance with terms of **Article 16** hereof; and  to make, sign, execute, certify and deliver any agreements, instruments, certificates and documents that may be required or appropriate to effect the dissolution and termination of the Company, including, without limitation, any instrument approved by the Class A Members creating or evidencing creation of a liquidating trust to receive distributions or other payment to Members in connection with the liquidation of the Company, to hold the same and earnings thereon for the benefit of the creditors and Members of the Company and, upon satisfaction of the trustee that all claims against the Company having priority over claims of the Members have been satisfied, to pay or distribute the remaining funds in priorities paralleling those set forth in this Agreement applicable to the proceeds of winding up.  The powers hereby conferred to make, sign, execute, certify and deliver agreements shall be deemed to include the powers to acknowledge, swear to, verify, file, record and publish the same.

### 17.2    Exercise and Survival

.  The power of attorney granted pursuant to **Section 17.1** hereof and any other power of attorney granted under this Agreement:   may be exercised by any such attorney-in-fact acting alone;  is a special power of attorney coupled with an interest and is irrevocable;  may be exercised by such attorney-in-fact by listing all of the principals executing any agreement, certificate, instrument or document with the single signature of such attorney-in-fact for all of said principals;  shall survive the dissolution of the Company through winding up to termination; shall survive the Transfer of the whole or part of a Member's Membership Interest, except where such Transfer is of the entire Membership Interest of such Member, and the transferee is admitted as a Substitute Member, the power of attorney shall survive such Transfer for the sole purpose of enabling any such attorney-in-fact to make, sign, execute, certify and deliver any agreements, instruments, certificates and documents that may be required or appropriate to effect such substitution; and  to the fullest extent permitted by Applicable Law, shall survive the death, disability, legal incapacity, Bankruptcy, insolvency, dissolution or cessation of existence of a Member.

## ARTICLE 18
## MISCELLANEOUS

### 18.1    Statutory Override

.  To the maximum extent permitted by Applicable Law, the provisions of this Agreement shall govern over all provisions of the Act that would apply but for (and inconsistently with) this

Agreement.  For each question with respect to which the Act provides a rule (a "**default rule**") but permits the operating agreement to provide a different rule; and that is addressed by this Agreement, the default rule shall not apply to the Company.

### 18.2    Code § 83 Safe Harbor Election

.

(a)    By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 200543 (the "**200543 Notice**") apply to any interest in the Company Transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company.  For purposes of making such Safe Harbor election, the Tax Matters Member is hereby designated as the "Partner who has responsibility for federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Member constitutes execution of a "Safe Harbor Election" in accordance with § 3.03(1) of the 2005-43 Notice.  The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the 2005-43 Notice, including, without limitation, the requirement that each Member shall prepare and file all federal income tax returns reporting the income tax effects of each Safe Harbor interest in the Company issued by the Company in a manner consistent with the requirements of the 2005-43 Notice.

(b)    Any Member that fails to comply with requirements set forth in **Section 18.2(a)** hereof shall indemnify and hold harmless the Company and each adversely affected Member from and against any and all losses, liabilities, taxes, damages, judgments, fines, costs, penalties, amounts paid in settlement and reasonable outofpocket costs and expenses incurred in connection therewith (including, without limitation, costs and expenses of suits and proceedings, and reasonable fees and disbursements of counsel), in each case resulting from such Member's failure to comply with such requirements.  The Tax Matters Member may offset distributions or other payments to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company and any other Person under this **Section 18.2(b)** (and any amount so offset with respect to such Person's obligation to indemnify a Person other than the Company shall be paid over to such other Person by the Company).  A Member's obligations to comply with the requirements of **Section 18.2(a)** hereof and to indemnify the Company and any Member under this **Section 18.2(b)** shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this **Section 18.2**, the Company shall be treated as continuing in existence.  The Company and any Member may pursue and enforce all rights and remedies it may have against each Member under this **Section 18.2(b)**, including instituting a lawsuit to collect such indemnification and contribution, with interest calculated, from time to time, at a rate equal to the prime rate plus four percentage points per annum (but not in excess of the highest rate per annum permitted by Applicable Law), compounded on the last day of each fiscal quarter and specific performance and/or immediate injunctive or other equitable relief from any court

of competent jurisdiction (without the necessity of showing actual money damages, or posting any bond or other security) in order to enforce or prevent any violation of the provisions of **Section 18.2(a)** hereof.

(c)     Each Member authorizes the Tax Matters Member to amend **Sections 18.2(a)** and **18.2(b)** above to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Company Transferred to a service provider by the Company in connection with services provided to the Company as set forth  in § 4 of the 2005-43 Notice (e.g., to reflect changes from the rules set forth in the 2005-43 Notice in subsequent Internal Revenue Service guidance), provided that such amendment is not materially adverse to such Member (as compared with the aftertax consequences that would result if the provisions of the 2005-43 Notice applied to all interests in the Company Transferred to a service provider by the Company in connection with services provided to the Company).

**18.3     Notices**

.   Any Notice shall be sent by  first class, regular, registered or certified mail;  commercial delivery service;  air or other overnight delivery service;  facsimile, electronic mail or other form of electronic transmission;  or  hand delivery, to the party to be notified addressed as follows:  if to the Company, to the Company at the address set forth in **Section 2.6(a)** hereof, or to such other address as the Company may from time to time specify by Notice to the Members; if to a Member to such Member at the address set forth in Unit Ownership Ledger attached hereto, or to such other address as such Member may from time to time specify by Notice to the Company.  Any such Notice shall be deemed to have been given and received for all purposes under this Agreement:   three (3) Business Days after the same is deposited in any official depository or receptacle of the United States Postal Service first class certified mail, return receipt requested, postage prepaid;  on the date of confirmed transmission when delivered by facsimile, electronic mail or other form of electronic transmission, provided that a copy is also promptly delivered by either of the means set forth in clause (a), (b), (c) or (e) above;  on the next Business Day after the same is deposited with a nationally recognized overnight delivery service that guarantees overnight delivery; and  on the date of actual delivery to such party by any other means; provided, however, if the day such Notice shall be deemed to have been given and received as aforesaid is not a Business Day (or if delivery is made after 5:00 p.m. (recipient's local time) on any Business Day), such Notice shall be deemed to have been given and received on the next Business Day.

**18.4     Binding Effect**

.   Except as otherwise provided in this Agreement or the Act, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Company, the Members, any Person who becomes a Member or Interest Holder after the date of this Agreement (a "**Subsequent Member**") and their respective Personal Representatives.  If a Subsequent Member otherwise complies with the conditions for becoming a Member or Interest Holder, every covenant, term and provision of this Agreement shall be binding upon each Subsequent Member, whether or not such Subsequent Member executes this Agreement or any

59

other written instrument evidencing the agreement of such Subsequent Member to be bound by this Agreement.

### 18.5    No Third Party Beneficiary

. This Agreement is made solely and specifically among and for the benefit of the parties hereto and their respective successors and assigns. Except and only to the extent provided herein or in the Act (or other Applicable Law), no creditor or any other Person shall have any right, interest or claims under or on account of this Agreement as a third party beneficiary or otherwise.

### 18.6    Written Agreement Required

. This LLC Agreement, any and all amendments hereto and any restated operating agreement of the Company shall be in writing, and all provisions of any such agreement shall be set forth in a single integrated document. For purposes of this provision, a document and all duly adopted amendments thereto shall be deemed to constitute a "single integrated document."

### 18.7    Construction

. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

### 18.8    Time

. Time is of the essence with respect to this Agreement.

### 18.9    Headings

. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

### 18.10   Severability

. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal, invalid or unenforceable for any reason whatsoever, such illegality or invalidity shall not affect the validity, legality or unenforceability of the remainder of this Agreement.

### 18.11   Incorporation by Reference

. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

### 18.12   Additional Assurances

. Each Member, upon the request of the Company, agrees to perform all further acts and execute, acknowledge, and deliver any documents that may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

### 18.13   Entire Agreement

. This Agreement and the Certificate constitute the entire agreement among the parties. No party shall be bound by any terms, conditions, statements or representations, oral or written, not contained herein or in the Certificate. Each party hereby acknowledges that he has not been induced, persuaded or motivated by any promise or representation made by any other party that is not expressly set forth herein. Except for the Certificate, all previous negotiations, statements and preliminary instruments by the parties or their representatives are merged in this Agreement.

### 18.14   Governing Law

. This Agreement shall be governed in all respects, including validity, interpretation and effect by, and shall be enforceable in accordance with the internal laws of the State of Pennsylvania without regard to conflicts of laws principles.

### 18.15   Waiver of Action for Partition

. As a material inducement to each Member to execute this Agreement, each Member covenants and represents to each other Member that, during the period beginning on the date of this Agreement, no Member, nor such Member's Personal Representatives, will attempt to make any partition whatever of the assets of the Company or any interest therein whether now owned or hereafter acquired, and each Member waives all rights of partition provided by statute or principles of law or equity, including partition in kind or partition by sale. The Members agree that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring such an action in a court to dissolve the Company; there are fair and just provisions for the payment and liquidation of the Membership Interest of any Member; and there are fair and reasonable grounds to prevent any Member from selling or otherwise alienating his Membership Interest. Accordingly, each Member hereby waives and renounces his right to such a court decree of dissolution or to seek the appointment by a court of a liquidator or receiver for the Company.

### 18.16   Counterpart Execution

. This Agreement may be executed in multiple counterparts, each one of which shall be deemed an original, but all of which shall be considered together as one and the same instrument. Further, in making proof of this Agreement, it shall not be necessary to produce or account for more than one (1) such counterpart. Execution by a party of a signature page hereto shall constitute due execution and shall create a valid, binding obligation of the party so signing, and it shall not be necessary or required that the signatures of all parties appear on a single signature page hereto.

### 18.17   Electronic Transmission

. Delivery of an executed counterpart of this Agreement or any other document, instrument notice, or communication required or permitted to be delivered pursuant to this Agreement (or executed signature pages to this Agreement or such other document, instrument notice, or communication required or permitted to be delivered pursuant to this Agreement) may be made by facsimile or other electronic transmission. Any such counterpart or signature pages

sent by facsimile or other electronic transmission shall be deemed to be written and signed originals for all purposes, and copies of this Agreement or any other document, instrument notice, or communication required or permitted to be delivered pursuant to this Agreement containing one or more signature pages that have been delivered by facsimile or other electronic transmission shall constitute enforceable original documents.  As used in this Agreement, the term "**electronic transmission**" means and refers to any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient of the communication, and that may be directly reproduced in paper form by such a recipient through an automated process.

### 18.18   Sole Discretion

. Except as otherwise provided in this Agreement, all actions that any Member may take and all determinations that any Member may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of such Member without regard to whether or not the exercise of such discretion is reasonable or unreasonable.

### 18.19   Specific Performance

. In view of  the complexities and uncertainties in measuring actual damages to be sustained by reason of the failure of a Member to perform this Agreement strictly in accordance with the specific terms hereof,  the uniqueness of the Company's business, and  the relationship among the Members, each Member acknowledges and agrees that:   the remedy at law for a breach of this Agreement would be inadequate, and  the Company and the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed strictly in accordance with their specific terms.  Therefore, it is expressly agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to specifically enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

*[signature page follows]*

[Signature Page to LLC Agreement]

MEMBERS:

_____
Steve Marinelli


_____
Dr. Chris Waganer


_____
Will Duffield


_____
Ed Karpowicz

# TABLE OF CONTENTS

**Page**

### ARTICLE 1
### DEFINITIONS AND RULES OF CONSTRUCTION

| | | |
|---|---|---|
| 1.1 | Rules of Construction | 1 |
| 1.2 | Definitions | 1 |

### ARTICLE 2
### ORGANIZATION

| | | |
|---|---|---|
| 2.1 | Organization | 9 |
| 2.2 | Adoption of LLC Agreement | 9 |
| 2.3 | Name | 9 |
| 2.4 | Purposes | 9 |
| 2.5 | Duration | 10 |
| 2.6 | Principal Office; Registered Office and Registered Agent | 10 |
| 2.7 | Filings | 10 |
| 2.8 | No State Law Partnership | 10 |
| 2.9 | Title to Company Property | 10 |
| 2.10 | Payment of Individual Obligations | 11 |

### ARTICLE 3
### MEMBERS AND CAPITAL CONTRIBUTIONS

| | | |
|---|---|---|
| 3.1 | Membership Interests | 11 |
| 3.2 | Members | 11 |
| 3.3 | Additional Members or Membership Interests | 11 |
| 3.4 | Capital Contributions | 12 |
| 3.5 | Capital Accounts | 12 |
| 3.6 | Other Matters | 13 |
| 3.7 | Additional Funds | 13 |

### ARTICLE 4
### ALLOCATIONS

| | | |
|---|---|---|
| 4.1 | Determination of Profits and Losses | 13 |
| 4.2 | Allocation of Profits | 14 |
| 4.3 | Allocation of Losses | 14 |
| 4.4 | Change in Financial Rights | 14 |
| 4.5 | Limitation on Losses | 15 |
| 4.6 | Special Allocations | 15 |
| 4.7 | Curative Allocations | 16 |
| 4.8 | Other Allocations Rules. | 17 |
| 4.9 | Tax Allocations. | 17 |
| 4.10 | Adjustment of Gross Asset Value | 18 |

### ARTICLE 5
### DISTRIBUTIONS

| | | |
|---|---|---|
| 5.1 | Cash Available For Distribution | 19 |
| 5.2 | Amounts Withheld | 19 |
| 5.3 | Limitation on Distributions | 19 |

### ARTICLE 6
### MANAGEMENT; RIGHTS, POWERS AND DUTIES OF MEMBERS

| | | |
|---|---|---|
| 6.1 | Management by Class A Members | 20 |
| 6.2 | Authority of the Class A Members | 20 |
| 6.3 | Restriction on Authority of Members | 20 |
| 6.4 | Action by Class A Members | 21 |
| 6.5 | Voting Rights | 21 |
| 6.6 | Committees | 21 |
| 6.7 | Standard of Conduct | 21 |
| 6.8 | Limitations on Liability. | 22 |
| 6.9 | Compensation, Expenses and Loans | 22 |
| 6.10 | Confidentiality. | 23 |

### ARTICLE 7
### MEETINGS OF THE MEMBERS

| | | |
|---|---|---|
| 7.1 | Meetings | 23 |
| 7.2 | Meetings by Electronic Communication | 24 |
| 7.3 | Notice of Meetings | 24 |
| 7.4 | Waiver of Notice | 24 |
| 7.5 | Record Date | 24 |
| 7.6 | Quorum | 25 |
| 7.7 | Voting List | 25 |
| 7.8 | Proxies | 25 |
| 7.9 | Voting and Voting Rights | 25 |
| 7.10 | Action without a Meeting | 25 |

### ARTICLE 8
### MEMBERS' REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 8.1 | General Representations and Warranties | 26 |
| 8.2 | Investment Representations | 27 |

### ARTICLE 9
### OFFICERS

| | | |
|---|---|---|
| 9.1 | Officers | 28 |
| 9.2 | Power and Authority of Officers | 28 |
| 9.3 | Election and Term | 29 |
| 9.4 | President | 29 |
| 9.5 | Right to Rely on the President | 30 |
| 9.6 | Duties of Other Officers | 31 |
| 9.7 | Standard of Conduct | 31 |
| 9.8 | Resignation | 32 |
| 9.9 | Removal | 32 |
| 9.10 | Vacancies | 32 |

9.11    Compensation                                                                          32

## ARTICLE 10
### CONFLICTS OF INTEREST TRANSACTION
10.1    Definition and Scope                                                                 32
10.2    Effect                                                                               32

## ARTICLE 11
### INDEMNIFICATION
11.1    Certain Definitions                                                                  32
11.2    Authority to Indemnify                                                               34
11.3    Mandatory Indemnification                                                            34
11.4    Advances for Expenses                                                                34
11.5    Determination and Authorization                                                      35
11.6    Not Exclusive; Prohibition Against Indemnification                                   35
11.7    Indemnification of Others                                                            36
11.8    Insurance                                                                            36

## ARTICLE 12
### FISCAL MATTERS; BOOKS AND RECORDS
12.1    Books and Records                                                                    36
12.2    Additional Records                                                                   36
12.3    Reports                                                                              37
12.4    Tax Returns                                                                          37
12.5    Special Basis Adjustment                                                             37
12.6    Tax Matters Member                                                                   38
12.7    Bank Accounts                                                                        38
12.8    Accounting Decisions                                                                 38
12.9    Taxes of Taxing Authority                                                            38

## ARTICLE 13
### NONCOMPETION
13.1    Independent Activities, Noncompetition, Non-Disclosure and Non-Inducement           39

## ARTICLE 14
### TRANSFER OF MEMBERSHIP INTERESTS
14.1    Restriction on Transfers                                                             41
14.2    Certain Permitted Transfers                                                          41
14.3    Conditions to Permitted Transfers                                                    41
14.4    Right of First Refusal                                                               42
14.5    Effect of Prohibited Transfers                                                       44
14.6    Rights of Unadmitted Transferees                                                     45
14.7    Admission of Transferees as Members                                                  45
14.8    Legend                                                                               46
14.9    Distributions and Allocations                                                        46
14.10   Withdrawal Rights                                                                    47
14.11   Expulsion                                                                            47

14.12   Appraisal and Dissenters' Rights                                              48
14.13   Special Rules Concerning Withdrawal in Initial Two Years                      48

ARTICLE 15
DISSOLUTION AND WINDING UP

15.1   Dissolution.                                                                   48
15.2   Continuation                                                                   48
15.3   Winding Up, Liquidation and Distribution of Assets                            49
15.4   Compliance with Requirements of Regulations                                   49
15.5   Deemed Contribution and Distribution                                          49
15.6   Certificate of Cancellation                                                   50

ARTICLE 16
AMENDMENTS

16.1   Amendments                                                                     50
16.2   Limitation on Amendments                                                       50
16.3   Execution of Amendments                                                        51

ARTICLE 17
POWER OF ATTORNEY

17.1   Appointment                                                                    51
17.2   Exercise and Survival                                                          51

ARTICLE 18
MISCELLANEOUS

18.1   Statutory Override                                                             52
18.2   Code § 83 Safe Harbor Election                                                52
18.3   Notices                                                                        53
18.4   Binding Effect                                                                 53
18.5   No Third Party Beneficiary                                                     54
18.6   Written Agreement Required                                                     54
18.7   Construction                                                                   54
18.8   Time                                                                           54
18.9   Headings                                                                       54
18.10  Severability                                                                   54
18.11  Incorporation by Reference                                                     54
18.12  Additional Assurances                                                          54
18.13  Entire Agreement                                                              54
18.14  Governing Law                                                                  54
18.15  Waiver of Action for Partition                                                54
18.16  Counterpart Execution                                                          55
18.17  Electronic Transmission                                                        55
18.18  Sole Discretion                                                                55
18.19  Specific Performance                                                           55

37768146v1